Case No. 17-1524
_____

## UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT
_____

AARON M. ROSENBERG,

*Plaintiff-Appellant*,

v.

REDFLEX TRAFFIC SYSTEMS, INC. and REDFLEX HOLDINGS, LTD.,

*Defendants-Appellees*.
_____

Appeal from the United States District Court
For the Northern District of Illinois, Eastern Division,
Case No. 15-cv-08271
The Honorable Judge John J. Tharp
_____

## BRIEF AND REQUIRED SHORT APPENDIX OF
## PLAINTIFF-APPELLANT, AARON M. ROSENBERG
[Oral Argument Requested]
_____

John J. Muldoon, III (ARDC # 6185878)
jjm@muldoonlaw.com
MULDOON & MULDOON, LLC
30 N. LaSalle St., Suite 2950
Chicago, Illinois 60602
Telephone: (312) 739-3550
Attorney for Plaintiff-Appellant
Aaron M. Rosenberg

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: ___17-1524___

Short Caption: __AARON ROSENBERG v. REDFLEX TRAFFIC SYSTEMS, INC. et, alia__

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

**[   ]    PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)  The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

Aaron Rosenberg

_____

_____

(2)  The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Muldoon & Muldoon, LLC

_____

_____

(3)  If the party or amicus is a corporation:

i)  Identify all its parent corporations, if any; and

_____

ii)  list any publicly held company that owns 10% or more of the party's or amicus' stock:

_____

Attorney's Signature: __s/  John J. Muldoon, III__          Date: __09/18/17__

Attorney's Printed Name: __John J. Muldoon, III__

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** _×_   **No** _____

Address: __30 N. LaSalle Street, #2950__

__Chicago, IL 60602__

Phone Number: __312-739-3550__          Fax Number: __312-346-6549__

E-Mail Address: __jjm@muldoonlaw.com__

rev. 01/15 GA

# TABLE OF CONTENTS

DISCLOSURE STATEMENT                                                 i

TABLE OF CONTENTS                                                    ii

TABLE OF AUTHORITIES                                                 v

STATEMENT OF JURISDICTION                                           1

ISSUES PRESENTED                                                    3

STATEMENT OF THE CASE                                              5

SUMMARY OF THE ARGUMENT                                           16

ARGUMENT                                                          20

    I. Standard of review                                         20

    II. The FCO's public disclosure analysis does
not apply in the first instance because Rosenberg
indisputably disclosed detailed information
to the government about Redflex's unlawful
scheme before the public disclosures at issue even occurred.       20

    III. Application of this Court's three-step
analysis shows that the public disclosure bar does
not apply to Rosenberg's claims.                                  23

        A. Rosenberg's extensive, detailed, and
specific allegations were not "based upon"
the general information about Redflex's conduct
that had appeared in news reports.                               25

           1. This Court repeatedly has held that
generalized information in press reports
does not bar complaints containing detailed
allegations on the same subjects.                               25

    2. Finding that Rosenberg's allegations
      were "based upon" the Tribune articles
      would undermine the purposes behind the FCO.    29

B. Even if his Complaint were based upon
   publicly disclosed information, Rosenberg
   is an original source of the facts alleged
   in his Complaint and the public disclosure
   bar therefore does not apply.    31

    1. Rosenberg has knowledge that is independent
      of and materially adds to the publicly disclosed
      allegations or transactions.    31

    2. Rosenberg "Voluntarily" Provided
      Information to the City.    33

VI. The Supreme Court's *Rockwell* decision is
   not applicable to this proceeding.    38

V. Whether or not the District Court erred in
   dismissing Rosenberg as relator, Rosenberg
   is entitled to a percentage of the City's recovery
   and his attorneys' fees and costs.    40

A. Rosenberg is entitled to a percentage of
   the City's recovery given that this lawsuit
   is primarily based upon Rosenberg's
   specific information.    40

B. Rosenberg is entitled to a percentage of
   the City's recovery as he brought this lawsuit
   and assisted in its prosecution.    41

C. The Court should award Rosenberg's
   attorneys' fees and costs, pursuant to the FCO.    43

CONCLUSION                                                                44

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)        46

CERTIFICATE OF SERVICE                                            47

CIRCUIT RULE 30(d) STATEMENT                                48

ATTACHED REQUIRED SHORT APPENDIX                    49

# TABLE OF AUTHORITIES

**CASES:**

*ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*,
672 F.3d 492 (7th Cir. 2012)                                    36

*Alderson v. United States*, 718 F. Supp. 2d 1186 (C.D. Cal. 2010)   41, 42, 43

*Cause of Action v. Chicago Transit Auth.*,
815 F.3d 267 (7th Cir. 2016)                                   23

*Glaser v. Wound Care Consultants, Inc.*,
570 F.3d 907 (7th Cir. 2009)                              21, 29, 32

*Graham City Soil & Water Conservation Dist. v.
United States ex rel. Wilson*, 559 U.S. 280 (2010)             29

*Kahr v. Markland*, 187 Ill. App. 3d 603 (1989)               36

*Leveski v. ITT Educ. Servs., Inc.*,
719 F.3d 818 (7th Cir. 2013)                              26, 32

*McCall v. Rivera*, 965 F. Supp. 2d 311, 322 (S.D.N.Y. 2013)      35

*Mississippi ex rel. Hood v. AU Optronics Corp.*,
134 S. Ct. 736, 741(2014)                                      36

*Pastors Protecting Youth v. Madigan*,
237 F. Supp. 3d 746 (N.D. Ill. 2017)                           37

*Prather v. AT & T Inc.*, 996 F. Supp. 2d 861 (N.D. Cal. 2013)    34, 35

*Rockwell Intern. Corp. v. U.S.*, 549 U.S. 457 (2007)       3, 38. 39,  40

*Sebelius v. Cloer*, 133 S. Ct. 1886 (2013)                     36

*Taniguchi v. Kan Pac. Saipan, Ltd.*, 132 S. Ct. 1997 (2012)     36

*U.S. ex rel. Heath v. Wisconsin Bell, Inc.*,
760 F.3d 688 (7th Cir. 2014)                                    24, 29

*U.S. ex rel. Goldberg v. Rush Univ. Med. Ctr.*,
680 F.3d 933 (7th Cir. 2012)                                        26

*U.S. ex rel. Mateski v. Raytheon Co.*, No. 13- 55341,
2016 WL 860337 (9th Cir. Mar. 7, 2016)                             27

*United States ex rel. Absher v.*
*Momence Meadows Nursing Ctr., Inc.,*
764 F.3d 699 (7th Cir. 2014)                                       20

*United States ex rel. Barth v. Ridgedale Elec., Inc.*,
44 F.3d 699 (8th Cir. 1995)                              33, 35,  37

*United States ex rel. Kelly v. Boeing Co.,*
9 F.3d 743 (9th Cir.1993)                                          43

*United States ex rel. Paranich v. Sorgnard*,
396 F.3d 326 (3d Cir. 2005)                              33, 34, 35

*United States v. Simmons*, 215 F.3d 737, 741 (7th Cir. 2000)       34

*Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*,
529 U.S. 765, 775 (2000)                                           41


CITY OF CHICAGO ORDINANCES:

Chicago Municipal Code § 1-22-010 *et seq*                          1

Chicago Municipal Code § 1-22-030                                  21

Chicago Municipal Code § 1-22-030(b)                               10

Chicago Municipal Code §1-22-030 (d)(1)                         40, 43

Chicago Municipal Code §1-22-030 (d)(2)                            43

Chicago Municipal Code §1-22-030 (d)(3)                    40, 43

Chicago Municipal Code § 1-22-030(f)                      31, 33

# JURISDICTIONAL STATEMENT[1]

Plaintiff-appellant, Aaron Rosenberg ("Rosenberg" or the "Relator,") brought a complaint on behalf of the City of Chicago (the "City") against Redflex Traffic Systems, Inc. ("RTSI") alleging violations of the Municipal False Claims Ordinance 1-22-010 *et seq.* of the City of Chicago Municipal Code ("FCO.") in the Circuit Court of Cook County, Illinois. The City intervened and RTSI removed the case to the United States District Court for the Northern District of Illinois based upon diversity jurisdiction. After the case was removed to the Northern District, the City filed an amended complaint against RTSI and its parent company, Redflex Holdings, Inc. ("RHI") (collectively, "Redflex").

The district court had jurisdiction pursuant to 28 U.S.C. § 1332(a), because this is a civil action between citizens of different States and a foreign company, to wit: Plaintiff-appellant is a citizen of California.

Defendant/Appellee Redflex Traffic Systems, Inc. is a citizen of the states of Delaware and Arizona. It is incorporated under the laws of Delaware and has its primary place of business in Arizona.

Defendant/Appellee Reflex Holdings, Ltd. is a citizen of the nation of Australia. It is an Australian incorporated company and is limited by shares that

---

[1] Citations in this Brief are formatted as follows: (1) citations to the Required Short Appendix attached to this brief are abbreviated as "R. App."; and (2) citations to the Supplemental Appendix District Court Docket are abbreviated "Supp. App."

are publicly traded on the Australian Securities Exchange. In Australia, a Company is defined to include a body corporate and any other unincorporated association or body of persons but does not include a partnership or a non-entity joint venture.

Plaintiff/Appellee City of Chicago is a citizen of the state of Illinois. The amount in controversy is over $75,000. The District Court for the Northern District of Illinois entered an order dismissing Relator/Appellant on the 2nd day of August 2016 and filed a memorandum opinion and order dismissing Mr. Rosenberg on the 8th day of August, 2016.

The District Court for the Northern District of Illinois entered the final judgment entered in this action on the 9th day of February 2017.

There are no remaining pending issues in the District Court but for Relator's petition for attorneys' fees pursuant to F.R.C.P. 54.

The District Court has not extended time to file an appeal under F.R.C.P. 58.

A Notice of Appeal was timely filed by Relator/Appellant on March 10, 2017.

There have been no prior or related appellate proceedings in this case.

## ISSUES PRESENTED

1.     Does the FCO's public disclosure analysis apply in the first instance to a relator who indisputably met with the government and provided detailed information and evidence to the government about the defendant's unlawful scheme before the public disclosures at issue even occurred?

2.     Where a relator files a qui tam complaint containing highly-detailed allegations regarding the defendant's unlawful scheme based on his own personal knowledge, does the FCO's public disclosure bar apply because some general information regarding the scheme had previously appeared in news stories?

3.     Where a relator willingly and without any subpoena or other legal obligation provided detailed information to the government about the defendant's wrongdoing, does the relator nevertheless fail to qualify as an original source simply because the government offered to make the interview "compelled" and confer use and derivative use immunity?

4.     Does the Supreme Court's jurisdictional analysis in *Rockwell Intern. Corp. v. U.S.*, 549 U.S. 457 (2007) apply in a case where the city has intervened on all of the relator's claims and allegations, and the relator is not separately prosecuting any claims in the case?

5.    Can the person who brings the action on behalf of the city be denied a share of the city's recovery simply because he was dismissed from the case under the public disclosure bar?

6.    Can the person who brings the action on behalf of the city be denied recovery of his statutory attorneys' fees and costs simply because he was dismissed from the case under the public disclosure bar?

## STATEMENT OF THE CASE

Rosenberg brought a complaint on behalf of the City of Chicago (the "Complaint") against RTSI alleging violations of the FCO in the Circuit Court of Cook County, Illinois.   Rosenberg's 162-paragraph Complaint alleged in painstaking detail a decade-long bribery scheme perpetrated by RTSI, providing song, chapter, and verse about how the bribery scheme began, how it worked, who was involved, and how RTSI profited from it.

After the City intervened and RTSI removed the case to the United States District Court for the Northern District of Illinois, the City filed an amended complaint against RTSI and RHI.  Rosenberg and his counsel worked closely with the City on the preparation of the Amended Complaint and had a common interest agreement with the City.  Supp. App. 268 at ¶9.   In addition to meeting the City's counsel, "Relator's Counsel drafted major provisions of the First Amended Complaint and supplied information for the City's Rule 26 Disclosures and discovery requests." Supp. App. 268 at ¶9.

RTSI and RHI (collectively "Redflex") moved pursuant to Rule 12(b)(1) to dismiss Rosenberg from the suit on the ground that he cannot serve as a *qui tam* relator.  Redflex argued (1) that Rosenberg's allegations had been publicly disclosed before he filed suit, and (2) he does not qualify as an "original source" of those allegations.  The District Court granted Redflex's motion, ruling that Rosenberg is

subject to the FCO's public disclosure bar, and the District Court therefore could exercise jurisdiction over his claims brought on behalf of the City. The District Court dismissed Rosenberg as relator on August 2, 2016.

After the City and Redflex announced that they had reached a settlement of the case, Rosenberg moved for both a share of the settlement proceeds and attorneys' fees and costs under the FCO. Rosenberg explained that as the person who brought the action, he was entitled to both a relator's share and his fees and costs under the plain language of the statute. The District Court denied the motion in its entirety.

Rosenberg then filed a timely notice of appeal.

1.  **Factual Summary.**

    A.  **Rosenberg begins working at Redflex and is introduced to the company's long-standing and pervasive practice of using improper gratuities and payments to obtain and keep government contracts.**

Redflex is in the business of providing traffic safety systems for municipal, county, and state entities in the United States and elsewhere, including automated red-light camera systems. Supp. App. 004 ¶¶ 17, 21. The City was among the customers to whom Redflex sold and maintained red light camera systems. *Id*. ¶ 21.

Rosenberg was hired by Redflex in March 2002 as the Vice President of Sales and Marketing. Supp. App. 004 ¶ 35. He represented Redflex in negotiations and other business dealings with the City from 2002 to 2012. *Id.* ¶ 24.

From the company's inception in the United States, Redflex directed and encouraged its employees to use gratuities to curry favor with actual and potential customers. *See* Supp. App. 004 ¶¶ 19-20, 23, 28, 38. Those customers were typically municipalities, cities, and other government agencies. *See id.*; *see also* Supp. App. 029. Lunches and dinners at high end restaurants, outings to golf and significant events (like Chicago White Sox baseball games), travel expenses, and gifts were all authorized and encouraged. *See* Supp. App. 004 ¶¶ 76-80. Redflex employed the systematic use of such gratuities nationwide. *See, e.g.*, Supp. App. 029 ¶¶ 278-79.

Redflex also encouraged and directed out-and-out bribery in certain key jurisdictions. Most notably, Redflex engaged in systematic bribery of John Bills ("Bills"), the Deputy Commissioner of the Chicago Department of Transportation, from 2003 through 2012 in connection with its contracts for the City's Red-Light Enforcement program. Supp. App. 004 ¶ 2. Redflex paid bribes in Chicago totaling millions of dollars to Bills through Martin O'Malley ("O'Malley"), who Redflex hired solely as a conduit to pay Bills. Supp. App. 004 ¶¶ 91-135.

Rosenberg was one of several Redflex executives and employees with visibility into the company's systemic wrongdoing, and is intimately familiar with the particulars of Redflex's illegal conduct in Chicago. *See* Supp. App. 004 ¶ 10.

**B.    The Chicago Tribune publishes stories focused on a single hotel bill Redflex paid for a single Chicago official.**

On October 14, 2012, the Chicago Tribune (the "Tribune") published an article reporting an allegation that Redflex had improperly paid a $910 hotel bill in Arizona for Bills.  Supp. App. 134-138.  As reflected in this and subsequent articles on the subject, Redflex management denied any intentional wrongdoing in connection with the hotel charge, characterizing both the charge itself and Redflex's failure to report it to the City as a one-time oversight.  *See* Supp. App. 090. (RTSI's general counsel stating that the failure to report the reimbursement was "a regrettable lapse and oversight").  Indeed, Redflex expressly directed employees to provide false information to outsiders to ensure that its gratuities and bribery schemes continued undiscovered and unabated.  *See, e.g.*, Supp. App. 004 ¶¶ 3-6, 40-43, 142-47.  When the Tribune raised questions about Bills and O'Malley, Redflex directed employees to falsely deny knowing the extent of their relationship, and to deny any improper relationship among Bills, O'Malley, and Redflex.  *Id.* (RTSI's general counsel stating that O'Malley was hired because the company needed someone familiar with Chicago to serve as an operations liaison with city hall, that he was unaware of O'Malley having any connection with Bills, and that O'Malley was a key component of the company's success in Chicago). *See* Supp. App. 091.

**C.    Rosenberg voluntarily discloses the details surrounding Redflex's bribery scheme to the City.**

Following the Tribune articles, the City opened an investigation into Redflex's relationship with the City.   *See* Supp. App 157. On February 4, 2013, Rosenberg was interviewed by representatives of the City at his counsel's offices in California. *See* Supp. App. 113 ¶ 5.  Rosenberg voluntarily agreed to be interviewed without a subpoena or any other form of legal compulsion.  *Id.* ¶¶ 3-4.  After Rosenberg had already voluntarily agreed to meet, City officials offered that the meeting would be treated as "compelled," which they explained would provide use and derivative use immunity to Rosenberg's statements.  *Id.*

During the February 4, 2013 interview, which lasted an entire day, Rosenberg provided extensive information regarding Redflex' relationship with the City of Chicago, including thorough and detailed information regarding both the travel and other benefits Redflex provided to Bills and the bribery scheme Redflex employed within the City.  Rosenberg also provided the City with hundreds of documents relating to Redflex's bribery scheme and other illegal activities in the City. Supp. App. 113. An attorney representing Redflex attended Rosenberg's interview.  with the City.  Supp. App. 113 ¶ 5.

In the months following Rosenberg's meeting with the City, the Tribune published additional articles regarding Redflex's relationship with the City.  In those articles, the Tribune vaguely described a suspected bribery scheme

involving Redflex, Bills, and O'Malley, while lacking any detailed information about the potential scheme or how it worked. *See, e.g.*, Supp. App. 176-222, 230-244. Notably, the Tribune articles relied in large part on public statements by Redflex in which the company acknowledged, for the first time and in stark contrast to its denials before the City's interview with Rosenberg's, that the company might have engaged in wrongdoing in its dealings with the City. *See, e.g.*, *id.* 212-214 (article titled Bribery Likely, Redflex Admits); *id.* 224-228. (RHI Australian stock exchange release stating that RTSI's conduct would "likely be considered bribery by the authorities").

## 2.    Procedural History.

### A.    Rosenberg files the present action and describes, based on his own knowledge, the specific details of Redflex's bribery scheme.

On April 15, 2014, Rosenberg filed the present action on behalf of himself and the City against RTSI for violations of the FCO pursuant to § 1-22-030(b). Supp. App. 004 ¶ 11.  In his Complaint – which spanned more than 20 pages and more than 160 paragraphs – Rosenberg described in painstaking detail the origins, mechanisms, and key players of the Redflex's bribery scheme. *See generally* Supp. App. 004 ¶¶ 22-51, 55-79, 83-106, 110-49.  Among other things, Rosenberg alleged:

- Bills's "Unlawful Pre-Bid Assistance," including details of his meetings with Rosenberg and Redflex CEOs Bruce Higgins ("Higgins") and Karen Finley ("Finley") addressing the particulars of what Bills told them he needed and they should do to ensure Redflex positioned itself to get the

bid, and information on Redflex's competitor ACS (Supp. App. 004 ¶¶ 24-40);

- Bills's "Unlawful Assistance with Field Tests," including his information about competitor ACS's tactics to gain the contract, and CEO Higgins's directives to Rosenberg about what to say to Bills (*id.* ¶¶ 44-51);

- Bills's "Unlawful Assistance With Evaluation Process," including his meeting with Rosenberg, Higgins and Finley to strategize about the evaluative process, Higgins and Finley's pledge to Bills that Redflex would have Rosenberg work with him to steer the contracts to Redflex, and Bills's dry-run with Rosenberg after hours at Chicago Department of Transportation to rehearse how Bills would get the Chicago Evaluation Committee to unanimously award Redflex the contract (*id.* ¶¶ 55-71);

- Higgins's steering Bills on the "Purchase vs. Lease of Cameras," including Higgins's strategy for making more money for Redflex by having the City buy the cameras (*id.* ¶¶ 72-75)

- Redflex's "Entertainment of City Officials," including details of Bills's entertaining Redflex CEOs Higgins and Finley, as well as RHL Chairman Chris Cooper, and Redflex's paying for golf outings, entertainment, and trips to Arizona for Bills (*id.* ¶¶ 76-79);

- Redflex's "Payoff to John Bills" including details of Higgins and Finley hiring Network Electric, Inc. as a subcontractor to accommodate Bills's relationship with the owner; Bills indicating the amount he wanted in the range of $100,000 to $200,000 in writing to Rosenberg at a meeting celebrating Redflex's award of the Chicago contract; Bills suggesting Redflex could make payments to him either by overpaying Mr. Johnson or hiring someone close to Bills in a customer liaison position; Redflex hiring O'Malley, a friend of Bills, to influence Bills's performance as deputy commissioner of the City's DOT and serve as a conduit for the company's bribes to Bills; paying Mr. O'Malley a bonus for each new system the City bought from Redflex plus commission for "out of scope" work changes that achieved additional revenue for Redflex and Bills, who was paid whenever it occurred; paying for Bills's travel expenses, hotel bills, rental cars, golf fees, and personal computers; and Bills protecting Redflex from

any liability for performance issues under its contract with the City (*id.* ¶¶ 83-106);

- Redflex's and Bills's "Expansion of Original Contract" including amending the Redflex contract so Redflex would receive a one-time fee of $100,000 per system and $5,000 per month per system; the City awarding a sole source agreement to Redflex; Finley and Rosenberg reviewing the draft RFP for program expansion and providing feedback to Bills, which resulted in the final RFP design specification being advantageous to Redflex; and Bills providing a scoring table that would demonstrate and justify a high scoring and ranking for Redflex (*id.* ¶¶ 110-122);

- Redflex's "Payoff for Extension of Contract" including O'Malley earning commissions in excess of $100,000; Redflex earning over $100 million in revenue for the implementation of additional traffic systems; Redflex falsely certifying as part of each contract that it had not engaged in bribery, while it was in fact bribing Bills; Redflex filing a false EDS certifying it had not engaged in bribery or attempted bribery of a public officer or employee of the City and that it was in compliance with the City's Code of Government Ethics; Bills ensuring that Redflex's performance issues were handed solely by him; Bills ensuring that any performance issue did not trigger any liquidated damage provisions specified in Redflex's contract; and Bills being paid through O'Malley until his retirement in 2011 (*id.* ¶¶ 123-135);

- "Bills Post-Employment Assistance," including Resolute Consulting hiring Bills directly or through a Redflex-funded public reach group called the Traffic Safety Coalition at the request of Redflex CEO Finley and General Counsel Andy Bunkse; Redflex's expectation to subsidize Bills's employment in order to receive the City's support; Redflex circumventing the City's prohibition against vendors hiring its former employees; Redflex securing additional contract extensions and new contracts for additional solutions; Redflex terminating O'Malley's commissions so Bills would not receive "double pay"; Redflex filing false statements certifying that it was not engaged in bribery of a public official in contracts and Redflex falsifying EDS's to the City (*id.* ¶¶ 136-149).

None of these facts had ever appeared in any news story or other public disclosure before Rosenberg filed his Complaint.

### B. The City intervenes, works with Rosenberg to prepare and file the Amended Complaint, and agrees with Rosenberg to work together in prosecuting the case.

On August 25, 2015, Rosenberg and the City entered into a Common Interest Agreement, in which they agreed to "jointly prosecute" the case against Redflex, "including without limitation appearing jointly at all court hearings, jointly working together on all discovery efforts, . . . and jointly participating in all motion practice and any and all evidentiary hearings." Supp. App. 271-273 ¶ 1.

On August 26, 2015, a day after having secured Rosenberg's assistance, the City exercised its statutory right to intervene in the case. Supp. App. 025 ¶ 2. RTSI then removed the case to the United States District Court for the Northern District of Illinois. *Id.* ¶ 3. Thereafter, the City and Rosenberg worked together on the preparation of the Amended Complaint, which the City then filed on December 14, 2015. Supp. App. 29.

The Amended Complaint largely tracks Rosenberg's original Complaint, while adding RHI as a defendant and including additional allegations relating to RHI's role in the alleged wrongdoing. Further, in the Amended Complaint the City averred to the fact that Rosenberg has extensive knowledge of Redflex's bribery scheme and brought his complaint based upon his "direct, independent knowledge"

of the violations of the FCO.  Supp. App. 029 ¶¶ 17, 18.  The City also sought a finding that Aaron Rosenberg, is entitled to a percentage of the total judgment entered in favor of the City on Count One of the Complaint, and reasonable expenses and attorneys' fees.  Supp. App. 029 Count I Prayer for Relief E.

### C. The District Court grants Redflex's motion to dismiss Rosenberg as relator, approves Redflex's settlement over Rosenberg's objection, and then denies Rosenberg both a statutory share of the settlement proceeds and his fees and costs.

On February 16, 2016, Redflex filed a motion to motion under Federal Rule of Civil Procedure 12(b)(6) to dismiss Rosenberg as the Relator based upon the public disclosure bar.  Supp. App. 82. On August 2, 2016, the District Court granted Redflex's motion.  R. App. 1. In its decision, the District Court ruled that the FCO's "public disclosure bar" applied to Rosenberg and that Rosenberg did not qualify as an "original source" of information because he (i) did not have "direct and independent knowledge" of the information on which the complaint was based, and (2) did not "voluntarily" provide information to the City.  *Id.*

On February 6, 2017, the City and Redflex filed an Agreed to Motion to Dismiss, seeking to dismiss the case with prejudice on the ground that the parties had settled the case.  Supp. App. 245. On February 8, 2017, Rosenberg filed an objection to the dismissal, seeking to conduct limited discovery regarding the fairness, adequacy, and reasonableness of the settlement in view of the fact that the City was settling the case for $30 million, a mere 5% of the recovery to which it was

entitled under the FCO, and that such recovery would be paid in installments over a period of seven years. Supp. App. 248. The District Court overruled the objection. Supp. App. 254.

On February 23, 2017, Rosenberg filed a motion for (1) payment of his share of settlement proceeds under the FCO, and (2) payment of attorneys' fees and costs under the FCO, or, alternatively payment of *quantum meruit* attorneys' fees and costs. Supp. App. 255. The District Court denied Rosenberg's motion in its entirety. R. App. 37.

On March 10, 2017, Rosenberg filed a notice of appeal with respect to each of the District Court's rulings against him.

## SUMMARY OF ARGUMENT

On February 4, 2013, Aaron Rosenberg voluntarily sat down with the City of Chicago and, over the course of a day-long interview, disclosed Redflex's unlawful conduct in meticulous detail.  He walked the City's investigators through every aspect of Redflex's decade-long bribery scheme – how it started, who was involved, how the bribes were paid, and how both Redflex and the City employee who solicited and accepted the bribes benefited.  Walking out of that meeting, as a result of Rosenberg's disclosures, City investigators for the first time understood the fraud that Redflex had perpetrated on the City and its residents.

Just over a year later, on April 15, 2014, Rosenberg brought this action on behalf of the City under the FCO.  Mirroring his early disclosures to the City, Rosenberg's 162-paragraph complaint thoroughly described every aspect of Redflex's unlawful bribery scheme, down to the dates, locations, and attendees of every key meeting and minute detail of how the scheme originated and played out.  And all of these allegations came directly from Rosenberg's own personal knowledge as the lone Redflex insider who was willing to tell the truth about what the company had done.

Yet after the City intervened in the case, the District Court granted a motion by Redflex to dismiss Rosenberg as relator.  The District Court did so based solely on the FCO's "public disclosure bar," ruling Rosenberg's Complaint was "based

upon" various news stories that came out in the months after his February 4, 2013 interview with the City. The District Court further ruled that Rosenberg did not qualify as an "original source" of the allegations in his Complaint. The District Court erred.

As a threshold matter, the FCO's public disclosure analysis does not apply in the first instance to Rosenberg given that he indisputably disclosed detailed information and supporting evidence to the government about Redflex's unlawful scheme before the public disclosures at issue even occurred. Indeed, the goal of the public disclosure bar is to prevent opportunists from attempting to capitalize on information already known, not to penalize whistleblowers who are the actual source of the public disclosure.

Even if the Court were to engage in the public disclosure analysis, however, Rosenberg would satisfy the standard, which requires the court to engage in a three-step analysis by (i) first examining whether the allegations in the complaint were "publicly disclosed" before the complaint was filed and (ii), if so, determining whether the relator's allegations are substantially similar to such public disclosures. If the answer to either question is no, then the analysis ends, as it should have here.

A review of the record reveals that Rosenberg's extensive, detailed, and specific allegations stand in stark contrast to generalities found in the news articles the District Court referenced in determining there was such a disclosure. Indeed, the

vague reports of a potential bribery scheme involving Redflex surfaced only after Rosenberg disclosed information to the government, and even then, the reports contained generalities, not specifics. Under Seventh Circuit precedent, relators with particularized information are not barred simply because there has been public disclosure of more generalized concerns, as is the case here. Accordingly, the District Court should have found that Rosenberg's allegations were not subject to the public disclosure bar, and ended its analysis there.

Turning to the third step of the analysis, even if a relator's complaint is based upon public disclosures, the bar still does not apply if the relator is an "original source" of the allegations in his complaint. To qualify as an original source, a relator must (i) be an individual who has direct and independent knowledge of the information on which the allegations of the complaint are based and (ii) have voluntarily provided such information to the government. Here, the District Court erred in determining he was not an original source of the information. The record is clear that Rosenberg had percipient, real-time knowledge of the information in the Complaint. He provided all of this to the City, including hundreds of documents that formed the basis for the allegations and the evidence to prove it. The District Court ignored this reality. Likewise, Rosenberg provided such information to the City on a voluntarily basis, as that term is understood under applicable Illinois law.

Finally, the FCO provides that "the person who brings the action" is entitled to a share of the recovery and attorneys' fees and costs, regardless of whether or not the complaint is based on publicly disclosed information.  The District Court erred in not allowing any recovery or fees for Rosenberg given that he is unquestionably "the person" who brought the action.

# ARGUMENT

## I.     Standard of review.

The applicable standard of review on this appeal is *de novo*.  *United States ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.,* 764 F.3d 699, 707 (7th Cir. 2014) ("[w]e review *de novo* challenges made pursuant to the FCA's bars").

## II.    The FCO's public disclosure analysis does not apply in the first instance because Rosenberg indisputably disclosed detailed information to the government about Redflex's unlawful scheme before the public disclosures at issue even occurred.

The instant case presents a situation where the information that was publicly disclosed appears based upon the relator's earlier statements to the government. Relator is a percipient witness with actual knowledge of all the relevant facts, who before the publications at issue presented the facts and provided the government a treasure trove of documents that were the bulk of the evidence supporting the entire case.

The sole ground upon which the District Court dismissed Rosenberg from this action was the FCO's statutory "public disclosure bar," which provides as follows:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a legislative, administrative, or Inspector General's report, hearing, audit, or investigation, or from the news media, unless the action is brought by the corporation counsel or the person bringing the action is an original

> source of the information.  For purposes of this subsection
> (f), "original source" means an individual who has direct
> and independent knowledge of the information on which
> the allegations are based and has voluntarily provided the
> information to the city before filing an action under this
> section which is based on the information.

MCC § 1-22-030.

Applying the three-step analysis employed by this Court in *See Glaser v. Wound Care Consultants, Inc*., 570 F.3d 907, 913 (7th Cir. 2009), the District Court ruled that the allegations in Rosenberg's Complaint had previously been publicly disclosed by the Chicago Tribune, that Rosenberg's allegations were based upon those public disclosures, and that Rosenberg was not an original source of the information in his Complaint.  As will be discussed in more detail below, the District Court erred on all fronts.  But even before reaching those issues, the District Court erred in applying the public disclosure analysis at all.

The purpose of the FCO, reflected in the three-step public disclosure bar analysis discussed below, is to strike the balance between (1) blocking opportunistic lawsuits filed by plaintiffs seeking to capitalize on information already in the public domain, and (2) encouraging lawsuits by relators who have firsthand knowledge of fraud against the government.  *Glaser*, 570 F.3d at 910.  It is axiomatic, however, that if the relator provided the information and evidence for the lawsuit to the government *before* the public disclosure, there is no need for a public disclosure analysis.  Here, it is undisputed that Rosenberg

provided the City with the information and evidence supporting the lawsuit *before* the alleged public disclosure.

The District Court based its erroneous findings of public disclosure on news articles published between February 8, 2013 and February 21, 2014. These publications are of no moment because Rosenberg had already given the information and evidence supporting the lawsuit to the City by that time. Specifically, on February 4, 2013, before any public disclosure of Redflex's systematic bribery scheme, Rosenberg met directly with the government itself—the City—and provided the relevant information and evidence upon which the case was brought in successfully resolved. After he did this, press reports appeared (likely the result of leaks from the City). Fully a month after Rosenberg's February 4th detailed disclosure to the City, the Tribune first disclosed on March 3, 2013 vague assertions of a bribery scheme involving Redflex's red-light camera contract with the City. In that article, the Tribune quotes "sources familiar with the City's outside investigation," the very investigators to whom Rosenberg disclosed the details of Redflex's bribery scheme a month earlier. This issue was not fleshed out at the District Court because the lower court erred by not allowing Relator an evidentiary hearing.

Rosenberg's dissemination of the information and evidence before the dates of the alleged public disclosures obviates the need for a public

disclosure analysis and warrants reversal of the District Court, and a remand with directions to award Rosenberg the relator's share in this settled lawsuit.

As the goal of the public disclosure bar is to prevent opportunists from attempting to capitalize on information already known, it does not make sense that it should be utilized against one who is the source of the public disclosure. Therefore, there is no need for this Court to undertake its three-step analysis. The Court should reverse the District Court's finding that Relator is barred from participation due to public disclosure.

## III. Application of this Court's three-step analysis shows that the public disclosure bar does not apply to Rosenberg's claims.

Even if a public disclosure analysis is warranted, Rosenberg is a proper relator under that analysis. In False Claims Act cases where it is debatable whether the lawsuit was based on publicly disclosed information, this Court has set forth a three-step analysis to determine whether the bar applies. First, the court examines whether the allegations in the complaint were "publicly disclosed" before the complaint was filed. *Cause of Action v. Chicago Transit Auth.,* 815 F.3d 267, 274 (7th Cir. 2016). If not, the bar does not apply and analysis ends there.

Only if the Court does find that the complaint's allegations have been publicly disclosed does it moves onto the second step, which is to determine whether the relator's lawsuit is "based upon" the publicly disclosed facts, meaning that it is

"substantially similar" to them. *Id.*  Again, if the answer is no, the analysis ends there and the bar does not apply.

If the Court answers affirmatively in each of the first two steps, it then moves to the third step, which is to assess whether the relator was an "original source" of the complaint's allegations. *Id.*  If so, the bar does not apply.  To qualify as an "original source" a relator must "show that he 'has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions' and 'has voluntarily provided the information to the Government before filing [his] action.'" *Id.* at 282.  While the relator has the burden of proof at each step of the analysis (*id.* at 274), the court must consider facts in the light most favorable to the relator.  *U.S. ex rel. Heath v. Wisconsin Bell, Inc.*, 760 F.3d 688, 689 (7th Cir. 2014) (holding that where case is "still in the jurisdictional phase," the court must consider the facts "in the light most favorable to" the relator).

Here, the records show that the District Court erred in its conclusion that Rosenberg's Complaint was based upon public disclosures.  The District Court should have found to the contrary, it analysis should have ended there, and it should have denied Redflex's motion.  Moreover, even if the District Court had properly reached the third step of the analysis, it should have concluded that Rosenberg was an original source of the information in his Complaint and denied Redflex's motion on that basis.

**A.     Rosenberg's extensive, detailed, and specific allegations were not "based upon" the general information about Redflex's conduct that had appeared in news reports.**

In finding that Rosenberg's allegations were "based upon" prior public disclosures, the District Court focused on the Tribune articles between late 2012 and early 2014 regarding Redflex and its relationship with Chicago.  R. App. 001 pp. 5-7, 20, 24.  The District Court found that because "The Rosenberg complaint simply did not reveal any information that added any new allegations or transactions that were involved in the … bribery scheme; the fraudulent nature of the relationship between RTSI and Bills had been known for a year and a half when Rosenberg filed his complaint, and his pleading did not expand the scope, objectives, or other fundamental aspects of the scheme."  R. App. 001 p. 28.  Therefore, the District Court concluded, Rosenberg's allegations were substantially similar to them and the first two steps of the public disclosure analysis were satisfied.  The District Court erred in reaching this conclusion.

**1.     This Court repeatedly has held that generalized information in press reports does not bar complaints containing detailed allegations on the same subjects.**

In the first two steps of the public disclosure analysis, a court compares the substance and allegations of the complaint to the public disclosure to see the degree to which they are the same.  For this analysis, courts have cautioned against viewing "FCA claims 'at the highest level of generality . . . in order to wipe out *qui tam* suits

that rest on genuinely new and material information.'" *Leveski v. ITT Educ. Servs., Inc.*, 719 F.3d 818, 831 (7th Cir. 2013).

Indeed, relators with particularized information are not barred simply because there has been public disclosure of more generalized concerns. *See, e.g.*, *U.S. ex rel. Goldberg v. Rush Univ. Med. Ctr.*, 680 F.3d 933, 935–36 (7th Cir. 2012) (public disclosure bar did not apply when relator was able to piece together specific information despite the presence of a corresponding government report); *U.S. ex rel. Mateski v. Raytheon Co.*, No. 13- 55341, 2016 WL 860337, at * 1-2 (9th Cir. Mar. 7, 2016) (following Seventh Circuit precedent, reversing dismissal of complaint based on public disclosure bar, finding that a federal report and a "slew" of news articles stating generalized concerns regarding Raytheon's radiometer project did not bar *qui tam* complaint with specific allegations of fraud).

This is exactly the case here. At their most specific, the Tribune articles stated generalized concerns about potential bribery at Redflex. They offered no details about the bribery scheme, including how it started, who all was involved, or the means and methods by which it was carried out. In fact, the Tribune articles did not even state definitively that any bribery had taken place. Rather, quoting Redflex press releases, the Tribune and other media outlets stated only that "bribery [was] likely" and that "some" of Redflex's payments to the City "probably" went to city officials. Supp. App. 212-217.

Moreover, the Tribune did not even publish its vague reports of a potential bribery scheme until February 8, 2013 (notably just days after Rosenberg had met with the City and disclosed the details of the scheme), and thereafter its stories remained high-level and speculative. On March 3, 2013, the Tribune first reported that Redflex had issued a press release about the bribery allegations. But even then, there was no detailing of the actual scheme, only generalities.

This stands in stark contrast to Rosenberg's Complaint, which provides song, chapter, and verse of Redflex's bribery scheme. The Complaint walks through, in painstaking detail, every aspect of Redflex's bribery of Bills, covering the entire life-span of the scheme. His allegations include extensive and detailed information regarding the travel and other benefits Redflex provided to Bills, as well as the actual cash bribes it paid to him. The information Rosenberg alleged in his Complaint included, among other things:

- The meetings Rosenberg and other Redflex employees had with Bills, in which Bills requested input as to how to draft the Request for Proposal in a manner which would be most advantageous to Redflex. (Supp. App 004 ¶¶ 27-29)

- Bills's efforts to assist Redflex in out-bidding Redflex's main competitor, Affiliated Computer Systems, Inc. ("ACS"). (*Id*. 1-2 ¶¶ 34-38, 49-53)

- Bills's assistance to Redflex in conducting field tests necessary for a successful bid. *Id*. 1-2 ¶¶ 44-48)

- The meetings Bills conducted with Redflex officials where Bills reviewed the field test results and assisted Redflex in its preparation for

the presentation of the results to the City's Evaluation Committee, which resulted in a unanimous vote in Redflex's favor. (*Id*. 1-2 ¶¶ 55-68)

- Bills's assistance in having the City buy the red-light cameras instead of leasing them from Redflex, as the purchases were more advantageous to Redflex. (*Id.* 1-2 ¶¶72-75)

- Bills instructions to have Network Electric, Inc. hired as one of Redflex' subcontractors. (*Id.* 1-2 ¶¶ 81-90)

- Bills assistance in the City's expansion of the original Redflex contract. (*Id.* 1-2 ¶¶ 110-122)

- The amounts Redflex originally paid to Bills and the increase in bribery payments over time. (*Id.* ¶¶123-135)

- The continuing payments to Bills after he left the City's employ, and the specific mechanisms through which those payments were routed. (*Id.* 1-2 ¶¶ 136-141)

None of this had appeared in any news story before Rosenberg filed his Complaint. Put simply, under no meaning of the term could Rosenberg's allegations be deemed "substantially similar" to the facts that had previously been disclosed to the public.

In granting Redflex's motion, the District Court misconstrued Rosenberg's argument. The District Court stated that "[w]hat Rosenberg seeks to do is establish that his own knowledge was not based upon publicly disclosed information, but that fact is relevant only to the question of whether Rosenberg qualifies as an "original source" of the information in the complaint; the Seventh Circuit has ruled that it has no bearing on the question of whether the complaint is

"based upon" publicly disclosed information." R.App. 029-030. Because Rosenberg's argument at this step is not that his allegations are based on his own knowledge (though they are); it is that his allegations are not "based upon" the public disclosures because they provide a legal of detail and specificity that is worlds beyond anything that had been disclosed publicly. The record show unequivocally that this is the case, and the District Court's ruling should accordingly be reversed.

> **2.    Finding that Rosenberg's allegations were "based upon" the Tribune articles would undermine the purposes behind the FCO.**

As described above, the public disclosure bar has two interlocking policy goals: (1) blocking opportunistic lawsuits filed by plaintiffs seeking to capitalize on information already in the public domain, and (2) encouraging lawsuits by relators who have firsthand knowledge of fraud against the government. *Glaser*, 570 F.3d at 910. Put differently, the goal behind the bar is to "prevent parasitic lawsuits by 'opportunistic plaintiffs who have no significant information to contribute of their own.'" *Heath*, 760 F.3d 688, 690 (7th Cir. 2014) (quoting *Graham City Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 294 (2010)). But the bar does not exist to prevent those with actual, first-hand knowledge of wrongdoing from pursuing qui tam claims.

Rosenberg is certainly not a parasite with no significant information to contribute. Just the opposite, he was the only Redflex employee to come forward

and speak truthfully about Redflex' bribery scheme. As of February 4, 2013 – while Rosenberg was fully disclosing Redflex's illegal conduct – Redflex continued to deny wrongdoing.

Moreover, there can be no question that Rosenberg had firsthand knowledge of the relevant facts. In fact, after it intervened in this action, the City – recognizing the unique and valuable information he possessed – requested that Rosenberg and his counsel work closely with the City in prosecuting the case. This led to the Common Interest Agreement in which the City and Rosenberg agreed to work together in literally every aspect of the case. And, consistent with that agreement, Rosenberg and his counsel worked hand in hand with the City and its attorneys in advancing the case from June 2015 through August 2016. Supp. App. 266 ¶ 3.

Further recognizing Rosenberg's knowledge and value to the case, Amended Complaint signed and filed by the City expressly says that Rosenberg has extensive knowledge of Redflex's bribery scheme and brought his complaint based upon his "direct, independent knowledge" of the violations of the FCO. Supp. App. 029 ¶¶ 17, 18. The City also sought a finding that Rosenberg is entitled to a percentage of the total judgment entered in favor of the City on Count One of the Complaint, and reasonable expenses and attorneys' fees. Supp. App. 029. Count I Prayer for Relief E. Again, the reason Rosenberg was able to provide value to the City was because he had the critical information the City needed to effectively prosecute this action.

In short, this case is not a parasitic lawsuit brought by an opportunistic plaintiff who has no significant information to contribute of his own.  Just the opposite, Rosenberg disclosed and detailed Redflex' bribery scheme to the government. His disclosure was based upon his own knowledge and supported with hundreds of documents he provided to the City.  This lawsuit was the product of Rosenberg's actual knowledge and evidence provided to the City and the record supports that.   The District Court's ruling to the contrary is unsupported by the record.  And even if this Court finds some ambiguity in the record, the District Court erred by refusing Rosenberg's request to have a hearing to more fully make that record.  The public disclosure bar does not pertain to him and the District Court's ruling should be reversed.

**B.   Even if his Complaint were based upon publicly disclosed information, Rosenberg is an original source of the facts alleged in his Complaint and the public disclosure bar therefore does not apply.**

**1.   Rosenberg has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions.**

An "original source" means "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the city before filing an action under this section which is based on the information." MCC § 1-22-030(f).  There is, accordingly, a two-part test to determine original source status: (1) the relator must have "direct and

independent knowledge" and (2) must have "voluntarily provided" the information before filing the action. In determining whether the relator has direct and independent knowledge, "[t]he question is whether the relator is an original source of the allegations in the complaint and not . . . whether the relator is the source of the information in the published reports." *Leveski*, 719 F.3d at 836.

In other words, "it is appropriate to ask whether [relator] is the original source of the specific allegations in her complaint." *Id.* "[A] relator's knowledge [is] not 'direct' if the relator 'had *no knowledge whatsoever* of the fraudulent conduct before hearing from an attorney.'" *Id.* "[A] relator's knowledge [is] not 'independent' if the relator would not 'have learned of the allegation or transactions independently of the public disclosure.'" *Id.* As noted above, Rosenberg is the source of the information in the Complaint.

*Glaser* illustrates the situation—unlike ours here—where a relator does *not* have direct and independent knowledge. After analyzing the public disclosure issue, the *Glaser* court turned to the question of whether the relator in that case could avoid the public disclosure bar by showing that she was an "original source" of information upon which the allegations in her complaint were based. The court held that she clearly was not. Indeed, the "only knowledge" relator had of the provider's billing came from her attorney whom relator "had no prior relationship" and "who contacted her out of the blue." 570 F.3d at 921. In other words, the relator "had *no knowledge*

*whatsoever* of the fraudulent conduct before hearing from an attorney." *Id.* (emphasis in original).

This is simply not the situation with Rosenberg. As described above, he had percipient, real-time knowledge of the information in the Complaint. He provided all of this to the City, including hundreds of documents that formed the basis for the allegations and the evidence to prove it. The Court's ignoring this reality, and refusing to grant an evidentiary hearing if this was in doubt, was error and requires reversal.

### 2.     Rosenberg "Voluntarily" Provided Information to the City.

If this court reaches the issue of whether Rosenberg was an original source, it must find that he "*voluntarily* provided the information to the city before filing an action." MCC § 1-22-030(f) (emphasis added).

Before turning to the merits, the District Court noted that the Seventh Circuit had not addressed the question of what constitutes a "voluntary" disclosure under the federal False Claims Act, and therefore the issue was one of apparent first impression in this circuit. R. 032. For guidance, the District Court looked to three out-of-circuit cases: *United States ex rel. Paranich v. Sorgnard*, 396 F.3d 326 (3d Cir. 2005), *United States ex rel. Barth v. Ridgedale Elec., Inc.*, 44 F.3d 699 (8th Cir.

1995), and *Prather v. AT & T Inc.*, 996 F. Supp. 2d 861 (N.D. Cal. 2013). [2]

Relying on these cases, the District Court reasoned that Rosenberg did not act voluntarily because he "disclosed information to the City only after he had been exposed and even then, only in response to the City's initiative." R. 030. The District Court erred in applying these cases, however, because they have an unduly restrictive definition of the word "voluntary" that either is not applicable to Rosenberg's circumstance or inconsistent with a plain meaning of the word.

In *Paranich*, for instance, the relator provided information to the federal government solely in response to a subpoena. *See Paranich*, 396 F.3d at 341 (counsel admitted during oral argument that "each of the seventy boxes [of information] was submitted in response to [a] subpoena and none was voluntarily provided to the government based on Paranich's own further investigation"). Failure to comply with a subpoena, of course, could have serious consequences, including criminal contempt. *United States v. Simmons*, 215 F.3d 737, 741 (7th Cir. 2000).

---

[2] Although not the basis for its decision, the District Court also referenced MCC § 2-56-090, which provides, in part: "It shall be the duty of every elected or appointed officer, employee, department, agency, **contractor**, subcontractor, agent or licensee of the city, and every applicant for certification of eligibility for a city contract or program, to cooperate with the inspector general in any inquiry undertaken pursuant to this chapter." (emphasis added). Notably, RTSI was a contractor with the City, not Rosenberg. Rosenberg did not have a direct contract with the city, either as contractor, employee, or otherwise. This provision does not apply to him.

Rosenberg was not subject to threat of contempt when he provided information to the City. Indeed, his meeting with the City was a voluntarily exercise that could have been terminated at any time. In that respect, the meeting was more akin to a proffer—a voluntary meeting at which the witness can leave at any time. *See, e.g., McCall v. Rivera*, 965 F. Supp. 2d 311, 322 (S.D.N.Y. 2013) ("Petitioner **voluntarily** participated in the proffer sessions with his attorney and it was clear that he could leave the session at any time.") (emphasis added). Thus, *Paranich*'s definition of voluntary is inapposite here.

The *Barth* court held that when one of the relators Barth provided information to the Department of Housing and Urban Development ("HUD"), he did not do so voluntarily because it was in response to a government inquiry. *U.S. ex rel. Barth v. Ridgedale Elec., Inc.*, 44 F.3d 699, 704 (8th Cir. 1995). The court's reasoning, however, was not based on a textual analysis, but rather depended on legislative "intent" and policy. *Id.* Specifically, the court stated, "Barth did not 'voluntarily' bring the information to the government and now rewarding him for merely complying with the government's investigation is **outside the intent** of the Act." *Id.* (emphasis added).[3] *Barth,* therefore, elevated policy considerations over principles of statutory construction.

---

[3] The *Prather* court, citing *Paranich* and *Barth*, also found that information provided in response to a government request was not voluntary. *Prather v. AT & T Inc.*, 996 F. Supp. 2d 861, 870 (N.D. Cal. 2013)

Rather than inserting "intent" into a statute, a court must begin its analysis with the text, as with all statutory construction cases. *Mississippi ex rel. Hood v. AU Optronics Corp.*, 134 S. Ct. 736, 741(2014). The FCO does not define voluntarily, so the court must interpret the word "in accordance with [its] ordinary meaning." *Sebelius v. Cloer*, 133 S. Ct. 1886, 1889 (2013). In ascertaining the ordinary meaning of voluntarily, dictionaries at the time of the original-source provision's enactment in 1986 provide a useful guide. *Taniguchi v. Kan Pac. Saipan, Ltd.*, 132 S. Ct. 1997, 2002 (2012). Using a pre-1986 dictionary definition, the Illinois Appellate Court has defined the word "voluntary" in the context of interpreting a provision of the UCC. *Kahr v. Markland*, 187 Ill. App. 3d 603, 607 (1989) (citing to Webster's Third New International Dictionary 2564 (1981)). According to the appellate court, under Illinois law, "voluntary" means "***proceeding from the will or from one's own choice or consent***" and "***done by design or intention***." *Id.* (emphasis added).

When a federal court faces a question of first impression, as is the case here, its duty is to interpret the law as best it can predict the Illinois Supreme Court would. *ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Prot. Dist.*, 672 F.3d 492, 498 (7th Cir. 2012). "In the absence of guiding decisions by the state's highest court," a federal court must "consult and follow the decisions of intermediate appellate courts unless there is a convincing reason to predict the state's highest court would

disagree." *Id.* Given that the FCO is an Illinois statute and the Illinois Appellate Court has defined voluntary under Illinois law, there is no reason this Court should deviate from that definition or otherwise follow the federal interpretation of the word found in *Barth* and its progeny, as the District Court did here. *Pastors Protecting Youth v. Madigan*, 237 F. Supp. 3d 746, 749 (N.D. Ill. 2017) ("As a federal court Interpreting Illinois law, the Court defers to Illinois' rules of statutory interpretation.")

Here, Rosenberg's disclosure to the City falls squarely within the Illinois definition of voluntary. Prior to his February 4, 2013 interview, Rosenberg informed the City, through counsel, that he would voluntarily submit to an interview. Supp. App. 112-113 ¶3. At no time did Rosenberg in any way condition his willingness to take part in the interview or provide full and complete information to the I.G. *Id.* ¶ 4. Accordingly, Rosenberg's disclosure was "***proceeding from [his] will***" and "***done by design,***" and therefore voluntary for purposes of the FCO.

Moreover, Rosenberg's voluntary conduct is best demonstrated by the City's actions in this lawsuit. The City is fully aware of Rosenberg providing the information and evidence to the City on February 4, 2013 during a full day, face-to-face meeting. Notably, after Rosenberg met with the City and provided the information, the City entered into the Common Interest Agreement with Relator and his counsel to work together in pursuing the instant lawsuit, and the City filed an

Amended Complaint affirmatively seeking a finding that Rosenberg is entitled to a percentage of the total judgment entered in favor of the City on Count One of the Complaint and reasonable expenses and attorneys' fees.  Supp. App. 029 Count I Prayer for Relief E.  The City clearly recognized that Rosenberg was at all times a valid relator and should be treated as such.

Accordingly, the Court's finding that Rosenberg did not act voluntarily is simply contrary to the facts of this matter.

## VI.     The Supreme Court's *Rockwell* decision is not applicable to this proceeding.

In ruling that Rosenberg was jurisdictionally barred from proceeding in this action irrespective of the City's intervention, the District Court relied on *Rockwell Intern. Corp. v. U.S.*, 549 U.S. 457 (2007).  R. App. 011-012. Specifically, the District Court ruled that Rosenberg was jurisdictionally barred from continuing in the case because he was subject to the public disclosure bar and not an original source under the FCO, even though the government and Rosenberg were advancing the same causes of action jointly.  R. App. 011-012. In contrast to this case, *Rockwell* involved a matter in which the government and the relator pursued *different* causes of action (with the relator's claims later abandoned), presenting a jurisdictional question involving the relator that is not applicable here.

As discussed above, the District Court erred in finding that Rosenberg was subject to the public disclosure and bar not an original source and therefore *Rockwell*

is not relevant.   But the District Court's reliance on *Rockwell* is nevertheless misplaced.   Specifically, *Rockwell* was an unusual case with a dual prosecution through trial by both the relator (Stone) and the government.   *Id.* at 465-466.   When the government intervened, it did so as to some of the relator's allegations and not others.   *Id.; see also U.S. ex rel Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 795 (10th Cir. 2002) (explaining that "the United States moved to intervene with respect to some, but not all of Stone's FCA allegations").   Stone remained in the case to prosecute his allegations over which the government failed to intervene based upon a set of facts that he was aware of when employed by Rockwell.   *Rockwell*, 549 U.S. at 464-65, 474-78; *Rockwell*, 282 F.3d at 806.   When the government intervened, it amended the complaint to add a separate set of facts which occurred after the relator left Rockwell and of which the relator had no knowledge.   *Rockwell*, 549 U.S. at 464-65, 474-78.   At trial, the set of facts brought by the relator was abandoned and the case proceeded to verdict on the additional set of facts of which the relator had no knowledge.   *Id.* at 474-78.   After the trial, the relator claimed a portion of the jury verdict; however, the court found that because the case was not prosecuted on the set of facts brought by the relator, it had no jurisdiction to award him a portion of the jury award.   *Id.* at 476.

The instant case is quite different from *Rockwell*.   The City has intervened on *all* of Rosenberg's claims and allegations, not just some of them.   Rosenberg,

meanwhile, is not separately proceeding on any allegations that the City is not. Moreover, the City and Redflex settled the case. Accordingly, there are no claims separate from the City's over which the District Court had to determine jurisdiction. *Rockwell*'s statement that jurisdiction over a relator remains relevant even after government intervention, therefore, does not apply here.

## V.    Whether or not the District Court erred in dismissing Rosenberg as relator, Rosenberg is entitled to a percentage of the City's recovery and his attorneys' fees and costs.

### A.    Rosenberg is entitled to a percentage of the City's recovery given that this lawsuit is primarily based upon Rosenberg's specific information.

Once a case is successfully resolved, the  FCO provides that: (1) the person who brings the action is entitled to 15% to 25% of the recovery if the lawsuit was based primarily on specific information from that person ("Level 1 Recovery"), (2) if the suit was not primarily based on the information from the person who brought the action, then that person is entitled to up to 10% of the recovery based on the significance of the information he provided and his role in advancing the case to litigation ( "Level 2 Recovery"), and (3) fees and costs to counsel for such a person. MCC §1-22-030 (d)(1), (d)(3).

Rosenberg is entitled to a percentage of the recovery under at least one of the first two bases above. As stated above, Rosenberg provided significant, specific information and he advanced the litigation.  In fact, he was the main witness in the

trial of John Bills, which resulted in a conviction on all counts of Redflex's bribery scheme. Supp. App. 93. Without the information Rosenberg provided, Redflex would continue to deny wrongdoing, and the City would not have recovered anything. Accordingly, Rosenberg is entitled to Level 1 Recovery and an award of 15-25% of the recovery.

### B.     Rosenberg is entitled to a percentage of the City's recovery as he brought this lawsuit and assisted in its prosecution.

But even with the District Court's finding that Rosenberg's Complaint was based on publicly disclosed information, Rosenberg is entitled to up to 10% of the recovery.  The FCO mandates payment in that range for a person who brings the lawsuit and assists in the prosecution of the case, even if that person's information is not the primary basis on which the lawsuit was conducted.

As set forth above, Rosenberg unquestionably brought the lawsuit, provided information that advanced the litigation and, therefore, is entitled to Level 2 Recovery.  *See Alderson v. United States*, 718 F. Supp. 2d 1186 (C.D. Cal. 2010). The *Alderson* court provided an overview of compensation for the person bringing a False Claims Act case.  In doing so, it stated that "in addition to the relator's recovery based on his services, the False Claims act—like all *qui tam* actions— 'allow [s] informers to obtain a portion of the penalty as a bounty for their information.'" *Alderson* 718 F. Supp. 2d at 1190 (quoting *Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 775 (2000)).

Recognizing the different levels of recovery to the relator based on the information and services provided to the government, the *Alderson* court noted that such a person is entitled to compensation even if the Court finds that the complaint was based on information *other* than that provided by the person bringing the action. *Alderson*, 718 F. Supp. 2d at 1190. The *Alderson* court further stated, "it is helpful to focus on the language of the statute, which plainly establishes that the award is a payment in exchange for the relator's information and services." *Id.*

Under the FCO, the Court should consider the significance of the information provided by that person and his role in advancing the case in determining what share—between zero and 10%—that person should receive. Rosenberg provided extensive information, had a major role in advancing the case and, consequently, should receive Level 2 Recovery at the high end of the spectrum.

From at least June 2015 through August 2016 Relator and Relator's Counsel worked hand in hand with the City's attorneys in the advancing this case. On August 25, 2015, shortly after intervening in this action, the City proposed that the Relator's attorneys enter into a Common Interest Agreement (the "agreement"). Supp. App. 271-274. The parties to the agreement were the City and Rosenberg. Most of this assistance was in response to direct requests from the City. Supp. App. 268 ¶ 11. Thus, the City clearly requested and received Rosenberg's knowledge and his counsel's assistance in advancing the case.

The agreement with the City only confirms the nature of the relationship between the parties in a *qui tam* action.  The FCO, like the federal False Claims Act, "'operate[s] as an enforceable unilateral contract' which is 'accepted by the relator upon filing suit.'"  *Alderson*, 718 F. Supp. at 1190 (quoting *United States ex rel. Kelly v. Boeing Co.,* 9 F.3d 743, 748 (9th Cir.1993)).  In support of this contractual relationship, in the Amended Complaint's prayer for relief, the City requested "a finding that under the FCO, Relator Aaron Rosenberg, is entitled to a percentage of the total judgment entered in favor of the City on Count One of the Complaint, and reasonable expenses and attorneys' fees." Supp. App. 29.

No one can question that Rosenberg and his counsel significantly advanced the litigation for the City.  Rosenberg falls within the plain language of section MCC § 1-22-030(d)(1)'s second sentence and should receive Level 2 Recovery of at least 10% of settlement proceeds based on (i) the substantial work he put into this case prior to filing the complaint and (ii) the material assistance he provided the City after filing the complaint and before he was dismissed.

### C.     The Court should award Rosenberg's attorneys' fees and costs, pursuant to the FCO.

Section 1-22-030(d)(3) of the FCO provides, in relevant part, that a *"[a]ny person entitled to an award under* [§ 1-22-030(d)(1) and (d)(2)], *shall* also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs." Given that this lawsuit is

primarily based upon Rosenberg's information entitling him to Level 1 recovery (and that he also brought the lawsuit and substantially assisted in its prosecution entitling him to Level 2 recovery), the FCO mandates an award of reasonable attorneys' fees and costs.  Indeed, the City acknowledged—through the Common Interest Agreement and the language it included in the Amended Complaint—that if the City wanted and needed the assistance of Relator's counsel, then Relator's attorney's fees and costs should be paid.  Refusing to award fees and costs not only violates the plain language of the statute, but the intent of the parties, and creates an undue windfall to the City.

## CONCLUSION

The public disclosure bar does not apply where Rosenberg disclosed Redlex's bribery scheme to the government before it was publicly disclosed by the Chicago Tribune or where the Tribune publicly disclosed information leaked to it by the City after receiving it from Rosenberg. Nor does the public disclosure bar apply where Rosenberg's extremely detailed lawsuit was not based upon any publicly disclosed information.

Rosenberg is an original source in that he has knowledge that is independent of, and materially adds to, any publicly disclosed allegations or transactions. Moreover, Rosenberg "voluntarily" provided the information to the City.

Rosenberg is entitled to a percentage of the City's recovery where this lawsuit is primarily based upon Rosenberg's specific information and his assistance in the prosecution of this lawsuit. Finally, Rosenberg is entitled to costs and attorneys' fees.

## **CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 32(a)(7)**

1.      This Brief complies with the type-volume limitation of Rule 28.1(e) of the

Federal Rules of Appellate Procedure because, according to the "word count"

function of Microsoft Word, the Brief contains 10330 words and 932 lines of text,

excluding the parts of the Brief exempted from the word count by Rule

32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure.

2.      This Brief complies with the typeface requirements of Rule 32(a)(5) and the

typestyle requirements of Rule 32(a)(6) of the Federal Rules of Appellate

Procedure because the Brief has been prepared in a proportionally spaced typeface

using Microsoft Word in 14 point Times New Roman font.

Dated:          October 12, 2017

                                        /s/ John J. Muldoon, III_____
                                        Attorney for plaintiff-appellant

☑

# CERTIFICATE OF SERVICE

**Certificate of Service When All Case Participants Are CM/ECF Participants**

I hereby certify that on __October 12, 2017__, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

S/ __John J. Muldoon, III_____

☐

# CERTIFICATE OF SERVICE

**Certificate of Service When Not All Case Participants Are CM/ECF Participants**

I hereby certify that on _____, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I further certify that some of the participants in the case are not CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days, to the following non-CM/ECF participants:

counsel / party:                          address:

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

_____          _____

S/ __John J. Muldoon, III_____

**CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30**

Pursuant to Seventh Circuit Rule 30(d) the undersigned certifies that

required by Circuit Rule 30 (a) and (b) are included in the appendix.


/s/ John J. Muldoon, III
Attorney for plaintiff-appellant

48

Case No. 17-1524

_____

# UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

_____

AARON M. ROSENBERG,

*Plaintiff-Appellant,*

v.

REDFLEX TRAFFIC SYSTEMS, INC. and REDFLEX HOLDINGS, LTD.,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
For the Northern District of Illinois, Eastern Division,
Case No. 15-cv-08271
The Honorable Judge John J. Tharp

_____

# APPENDIX TO BRIEF OF
# PLAINTIFF-APPELLANT, AARON M. ROSENBERG

_____

John J. Muldoon, III (ARDC # 6185878)
jjm@muldoonlaw.com
MULDOON & MULDOON, LLC
30 N. LaSalle St., Suite 2950
Chicago, Illinois 60602
Telephone: (312) 739-3550
Attorney for Plaintiff-Appellant
Aaron M. Rosenberg

## REQUIRED APPENDIX TABLE OF CONTENTS

District Court's 8/8/16 Memorandum Opinion and Order          R. App.   1

District Court's 4/27/17 Order                                R. App. 37

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CITY OF CHICAGO *ex rel.* AARON ROSENBERG, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 15 C 08271 |
| REDFLEX TRAFFIC SYSTEMS, INC. AND REDFLEX HOLDINGS, LTD., | ) ) ) | Judge John J. Tharp, Jr. |
| Defendants. | ) ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Aaron Rosenberg was a senior executive with Redflex Traffic Systems, Inc. ("RTSI") from 2002 to February 2013. Rosenberg initiated this law suit on behalf of the City of Chicago in April 2014 by filing a *qui tam* complaint alleging that RTSI violated the City's False Claims Ordinance ("FCO"), Chicago Mun. Code ch. 1-22, by orchestrating a bribery scheme to secure contracts with the City to provide and maintain its digital automated red-light camera enforcement program ("DARLEP"). The City intervened and filed an amended complaint against RTSI and its parent company, Redflex Holdings, Inc. ("RHI") (collectively, "Redflex"). Redflex has now moved pursuant to Rule 12(b)(1) to dismiss Rosenberg from the suit on the ground that he cannot serve as a *qui tam* relator, asserting that his allegations had been publicly disclosed, he does not qualify as an original source of those allegations, and his claim is really a claim under Chicago's False Statements Ordinance, which does not permit *qui tam* suits. Given the City's intervention, the last argument is moot, but the Court agrees that Rosenberg was not authorized under the FCO to bring this suit on behalf of the City. Because Rosenberg is subject to the FCO's public disclosure bar, the Court cannot exercise jurisdiction over any claim he has

advanced and therefore grants the City's motion under Fed. R. Civ. P. 12(b)(1) to dismiss him from the case.

## BACKGROUND

The facts relevant to this motion are largely undisputed. That is because, for the most part, what is relevant to this motion, which is based primarily upon the public disclosure bar, are not the actual facts relating to the alleged bribery scheme, but what Rosenberg and others have said about the scheme and the import of those statements.

### 1.    The Allegations of the Rosenberg Complaint

In the original complaint, which will be referred to as the Rosenberg complaint, the relator alleged that the DARLEP bribery scheme began in 2002 when RTSI, at the direction of RHI's Chairman Christopher Cooper, and RTSI's CEO, Bruce Higgins, launched an effort to improve RTSI's market position in the United States. At the time, Rosenberg was RTSI's Vice President for Sales and Marketing in North America. Responding to the initiative, Rosenberg began discussions with John Bills of the City's Department of Transportation. From Bills, Rosenberg learned that the City was planning to issue an RFP for digital automated red light enforcement systems. Though the complaint is vague on details about the developing relationship between Rosenberg and Bills, it alleges that Bills sought RTSI's assistance with developing the scope of services for the City's RFP (¶ 27-28), discussed ways to structure financial terms that would be advantageous to RTSI (¶ 29), and that Bills provided inside information about Affiliated Computer Systems, Inc. ("ACS"), the company that he anticipated would be RTSI's principal competitor for the contract. According to Rosenberg, Bills gave this information to him to curry favor with RTSI so Bills could later ask RTSI to compensate him for his assistance in securing the contract with the City. This information included communications about ACS's existing ties to the City and its efforts to secure the contract both by opening an

office in Chicago and offering a $100,000 bribe to Bills for his assistance. Bills exhorted RTSI

needed to "step up its game" if it wanted to win the contract.

After the City conducted field tests of competing systems, the Rosenberg complaint

alleges, Rosenberg worked with Bills to develop the evaluation protocol for the field tests and on

the night before the Evaluation Committee met, Bills reviewed the field test data with Rosenberg

and strategized about how to maximize the prospects that RTSI would be selected as the vendor

by selecting favorable photographs taken by RTSI's cameras and manipulating the voting order

of the committee members.

In June 2003, the City accepted RTSI's proposal and began contract negotiations with

RTSI. During the negotiations (and thereafter), the Rosenberg complaint alleges (under a

heading "ENTERTAINMENT OF CITY OFFICIALS") that Bills provided extensive

entertainment to RHI/RTSI executives, including Cooper, Higgins, and Finley.[1] This set of

allegations also includes a claim that on one occasion (date unspecified), Bills flew to Phoenix to

meet with RTSI executives and that RTSI reimbursed him for the cost of the trip and also

provided rounds of golf and other entertainment. (¶ 78-79).

After the City's initial contract with RTSI was finalized, Rosenberg alleges that Bills told

him that "it's time to make good," and indicated that he wanted RTSI to pay him between

$100,000 and $200,000. Bills suggested that he could be paid by overpaying Network Electric, a

subcontractor with ties to Bills and which Bills had required RTSI to use, or by hiring someone

close to Bills in a customer liaison position. Ultimately, in August 2003, RTSI hired a friend of

---

[1] Neither Rosenberg's complaint nor his briefs in response to Redflex's motion to dismiss explain the allegations that Bills provided extensive entertainment to Redflex executives; as the heading of this section of the complaint and the bulk of the allegations in the complaint suggest, the bribery scheme included payments by RTSI for lavish entertainment provided to Bills, not the other way around.

Bills, Martin O'Malley, ostensibly as a consultant but really to serve as a conduit for payments from RTSI to Bills. Between 2003 and 2011 (when Bills retired from the City), RTSI paid O'Malley over $2,000,000; O'Malley's invoices were approved by Higgins and Finley. The Rosenberg complaint alleges that some portion (no specific amount is alleged) of these funds was paid to Bills and that RTSI routinely paid travel and other expenses for Bills. For his part of the ongoing scheme, the complaint alleges that Bills protected RTSI from any liability for performance issues under its contract with the City.

Between 2003 and 2008, the scope of the City's red-light camera program expanded significantly, increasing the number of systems from 20 to several hundred. The complaint alleges that Bills assisted RTSI in obtaining new contracts with the City by providing specifications that would be favorable to RTSI and allowing RTSI to review and comment on the draft specifications before they were published.

Finally, the Rosenberg complaint alleges that when Bills retired from the City in 2011, RTSI arranged (at Bills' request) for Bills to be hired by Resolute Consulting, a public relations firm with which Redflex worked extensively. It was anticipated that this arrangement would circumvent the City's prohibition on vendors hiring former City employees, and that Bills would continue to support RTSI's efforts to expand the scope of its red-light contracts with Chicago. At that point, Rosenberg alleges, RTSI stopped making payments to O'Malley because it was not going to "double pay" Bills by making payments to Bills through both O'Malley and Resolute Consulting.

The long-running bribery scheme gave rise to false claims by RTSI under its contracts with the City, Rosenberg's complaint claims, because in connection with those contracts, RTSI was required to sign Economic Disclosure Statements ("EDS") certifying, among other things,

that it had not engaged in bribery or attempted to bribe any employee of the City. Because these false certifications caused the City to pay RTSI under the DARLEP contracts, the Rosenberg complaint claims that RTSI's claims for payment under those contracts are actionable under the City's FCO.

      2.    *The Chicago Tribune Articles*

Beginning in October 2012, the Chicago Tribune began publishing a series of articles relating to the City's DARLEP contracts with RTSI. Between October 2012 and February 2014, the Tribune published dozens of articles concerning the contracts and the relationships between Bills, RTSI, and O'Malley. Perhaps most significant for purposes of this motion are five of the earliest articles, published on October 14, October 17, and November 13 of 2012, and on February 8 and March 3, 2013. In the October 14 article, the Tribune reported that two years earlier, in August 2010, an RTSI executive (not Rosenberg) had alleged that there was "an improper relationship between Bills and O'Malley" and that O'Malley's role as liaison between RTSI and the City for the red-light program was unnecessary. The executive reported that, after retiring from the City, Bills then went to work for the Redflex-funded Traffic Safety Coalition (run by Resolute Consulting). The executive also alleged that RTSI had paid for Bills' tab at a luxury hotel in Phoenix. These allegations, the story reported, prompted an internal investigation by RTSI that concluded that there was no improper relationship but confirmed that Bills' hotel tab had been mistakenly paid by the company. RTSI did not, however, report the mistake to the City.

Three days later, on October 17, 2016, the Tribune followed up with a report that the City had made RTSI ineligible to bid on a new speed light camera program because of RTSI's failure to report the 2010 payment for Bills' hotel. The Tribune also reported that the City had

confirmed that its Inspector General was investigating "much broader allegations of wrongdoing involving the company's relationship" with Bills. The next month, the Tribune reported that RHI had hired Chicago-based law firm Sidley Austin to assist it in responding to the Chicago IG's investigation and to conduct its own internal investigation regarding the relationship between Bills and O'Malley. Several months later, on February 8, 2013, the City announced that RTSI would be ineligible to bid on a new red-light camera contract when its contract expired, based on findings by Sidley Austin that RTSI had "systematically courted" Bills "with thousands of dollars in free trips to the Super Bowl and other sporting events," "hid the extent of the improper relationship from City Hall," and that a number of company executives were implicated in the wrongdoing. On March 3, the Tribune reported that RHI had issued information releases to the Australian Stock Exchange reporting the findings of the company's internal probe and concluding that the conduct would likely be considered by law enforcement authorities as bribery. The Tribune articles relating to RHI's securities releases reported the substance of the releases (which is detailed further below).

More articles followed over the course of the next year, including articles reporting on Redflex's termination of Rosenberg, Findley, and other executives as the result of its internal probe, a lawsuit that RTSI filed against Rosenberg in Maricopa County, Arizona (RTSI is based in Phoenix) and Rosenberg's counterclaims in that suit against RTSI. Those pleadings included allegations by RTSI that Rosenberg made "inappropriate payments and gifts on behalf of Redflex to employees or agents of Redflex customers; [and] attempt[ed] to conceal his misconduct by, for example, submitting expense reports without supporting documentation, altering the dates chares were incurred and altering the description of the charges on the expense reports so as to disguise their true nature," as well as Rosenberg's contention that he was a

scapegoat for the company's long-standing practice of plying government officials with lavish gifts and bribes to win business. The Tribune reported Rosenberg's cooperation with the U.S. Attorney's Office in Chicago in January 2014 and its coverage preceding the filing of the Rosenberg complaint culminated in an article on February 21, 2014, that reported an account of an initial meeting between Bills and RTSI officials, including Rosenberg and Finley, at which Bills reportedly coached the RTSI team on what to do and say during the next day's proposal presentation at City Hall.

      *3.*     *The Inspector General's Investigation*

As reported in the October 17, 2012 Tribune article, the City's Office of Inspector General ("OIG") began an investigation relating to the allegations of financial improprieties in the relationships between Bills, O'Malley and RTSI. The OIG served a request for documents on RTSI on October 18, 2012. That request, which began by reciting the provision of the Chicago Municipal Code that requires vendors to cooperate with the OIG in any investigation pertaining to city contracts, sought documents and information relating to (among other things):

- all communications between RTSI and Bills;

- Rosenberg's expense account and reimbursement requests;

- the relationship between Bills, O'Malley, and Rosenberg;

- O'Malley's job duties;

- the process by which O'Malley was hired by RTSI;

- any gifts or payments made to Bills; and

- RTSI's involvement with the Traffic Safety Coalition and Resolute Consulting.

By December 2012, the IG was interviewing witnesses and on February 8, 2013, the City announced that RTSI would be ineligible to bid on future DARLEP contracts.

4.    *Sidley Austin Meeting with the Inspector General*

The City's action in declaring RTSI ineligible for further red-light camera contracts came after Sidley Austin attorney Scott Lassar met with a representative of the OIG on January 31, 2013. According to an affidavit by Lassar that Redflex submitted in support of its motion, RTSI retained Sidley Austin in connection with the IG's investigation. During his meeting with the OIG representative, Lassar attests that he provided "extensive information" about the relationship between RTSI and Bills, including findings that:

- RTSI paid for 17 trips for Bills and O'Malley, including expenses for air fare, luxury hotels, and golf fees;

- Bills had initiated a bribery scheme by offering to help RTSI secure the red-light camera contract in exchange for payments from RTSI;

- Bills told RTSI that it needed his assistance because ATS, a competitor of RTSI, had clout with the City;

- O'Malley was hired by RTSI at Bills' suggestion and served as a conduit for payments from RTSI to Bills;

- Between 2003 and 2012, RTSI had paid O'Malley over $2 million; and

- Network Electric may also have served as a conduit for payments to Bills.

5.    *Rosenberg's Meeting with the Inspector General*

A few days later, on February 4, 2013, Rosenberg met with OIG representatives (including Christopher McClellan, who had also been present for Lassar's report a few days earlier) at the office of Michael Williams, one of Rosenberg's attorneys, at Williams' office in California. An attorney from Sidley Austin (the record does not reflect whether this was Lassar or someone else) was also present. Rosenberg's submission does not provide the genesis of this meeting, but in a supporting affidavit, Williams represents that in a January 17, 2013 phone call with the OIG, he advised the City officials that Rosenberg "would be happy to voluntarily submit

to an interview with" the OIG. Williams also attests that after he confirmed that Rosenberg was willing to meet voluntarily, McClellan informed him that because Rosenberg worked for a city contractor, the OIG would provide an "Advisement" to him at the outset of the interview that warned that the information provided in the interview could be the basis of adverse action by the City. The Advisement also warned Rosenberg that the interview was "part of an official investigation" and that he had "a duty to cooperate with the Inspector General's Office," and that "any statement made . . . during this interview and the fruits thereof cannot be used against me in a criminal proceeding."

According to Williams' affidavit, Rosenberg's interview by the OIG lasted "nearly a full day." During the interview, "Rosenberg provided extensive information regarding Redflex's relationship with the City of Chicago, including":

- information regarding travel and other benefits RTSI provided to Bills;

- the bribery scheme between RTSI and Bills;

- the origin of the scheme;

- the use of O'Malley as a conduit for the payments from RTSI to Bills;

- the communications within RTSI about the scheme; and

- the knowledge of the scheme by RTSI's upper management.

Williams' affidavit also represents that Rosenberg also provided "at least hundreds of documents" to the City IG, though his submission does not state clearly when those documents were provided.

RTSI fired Rosenberg two weeks later, on February 20, 2013. Finley and several other RTSI executives were fired on March 2, 2013, in conjunction with Redflex's public

announcements concerning the results of its internal investigation concerning the Chicago DARLEP.

  6. *The RHI ASX Release*

  On March 4, 2013, RHI issued a public release to the Australian Securities Exchange (ASX) divulging results from its internal investigation of RTSI's contracts with the City. Among other things, the release noted that the internal investigation had focused on whether payments to O'Malley were funneled to Bills and whether RTSI had paid for vacations for Bills. Payments of more than $2 million to O'Malley were documented, along with the payment by RTSI of expenses for at least 17 different trips by Bills. The release reported that, based on the investigation, RTSI had concluded that the financial arrangements between Bills, O'Malley, and RTSI "will likely be considered bribery by the authorities," that some portion of the payments to O'Malley were funneled to Bills, and that both Finley and Rosenberg were in positions to know that the payments were improper. The release also reported that prior information provided by RTSI to both the Chicago Board of Ethics and to the Tribune was "inaccurate and misleading" and that the company officials responsible for those disclosures "knew or should have known this." The Chicago Tribune reported the substance of the information developed during the internal investigation on March 3, 2016, and reported the fact of the ASX release and its substance in another article in its March 4, 2013 edition.

  7. *The Federal Criminal Investigation*

  At some point in late 2012 or early 2013, the RTSI DARLEP bribery scheme came under federal criminal investigation. (This fact, too, was reported by the Chicago Tribune as early as March 16, 2013.) Rosenberg was interviewed by federal law enforcement agents after receiving an immunity agreement. Information that Rosenberg provided to the City in his meeting with the

OIG representatives,[2] and additional information provided in the subsequent immunized interviews with federal agents, was used to support the issuance of a criminal complaint against Bills in May 2014. Bills was later indicted and was convicted of bribery after a jury trial in January 2016. Former RTSI CEO Karen Finley and Martin O'Malley pleaded guilty to charges arising from the scheme.

    8.    *The Procedural History of this Case*

    Rosenberg filed his original complaint under seal in state court on April 15, 2014 against RTSI only. The substantive content of the complaint has already been described above. The complaint set forth a single claim for violation of the Chicago False Claims Ordinance. The City intervened in the suit on August 26, 2015, the seal was lifted, and RTSI was served. RTSI then removed the case to federal court. Following removal, the City filed an Amended Complaint, which added RHI as a defendant, and supplemented the FCO claim with an additional claim under the Chicago municipal code as well as various Illinois statutory and common law claims. Of particular note, Count Two of the City's Amended Complaint asserts a claim under the City's False Statements Ordinance based on the submission of false EDSs and invoices in connection with the City Contracts. Rosenberg is not a party to any of these additional claims.

## DISCUSSION

    At the threshold, it bears noting that the City's intervention does not render the relator's participation in this suit superfluous as a legal matter. The City is an intervenor, not a substituted party, and as the Supreme Court explained in *Rockwell Int'l Corp. v. United States*, 549 U.S.

---

[2] The affidavit in support of the criminal complaint states that the OIG "compelled CS1 [Rosenberg] to sit for an interview" in December 2012. (Dkt. 30-8, Ex. H at 6 n.1). Rosenberg, who relies on this affidavit to support his arguments, does not contest its characterization of his meeting with the OIG. With respect to the date of that meeting, no other exhibit or submission refers to any interview of Rosenberg by the OIG in December 2012; the parties appear to agree that Rosenberg's first meeting with the OIG was on February 4, 2013.

457, 476-78 (2007), the federal False Claims Act expressly provides that the relator may

continue as a party after intervention by the government:[3]

> An action brought by a private person does not become one brought by the Government just because the Government intervenes and elects to "proceed with the action." Section 3730 [of the federal False Claims Act] elsewhere refers to the Government's "proceed[ing] with an action brought by a person under subsection (b)"—which makes crystal clear the distinction between actions brought by the Government and actions brought by a relator where the Government intervenes but does not oust the relator.

Thus, the Government's intervention in this case does not itself "oust" Rosenberg from

this case; he may remain a party to the case unless it is determined that he is jurisdictionally

barred from asserting a claim by the public disclosure bar. But, "[w]here a relator fails to qualify

as an 'original source,' government intervention does not cure the jurisdictional defect." *U.S. ex.

rel. Lisitza v. Johnson & Johnson*, 765 F. Supp. 2d 112, 120 (D. Mass. 2011). In that instance,

government's intervention does not permit the would-be relator to continue in the case; if the

would-be relator is jurisdictionally barred from asserting a claim, the government's intervention

does convert the case to one brought by the government. *Rockwell*, 549 U.S. at 478 ("an action

originally brought by a private person, which the Attorney General has joined, becomes an action

---

[3] The parties agree that the City's FCO is substantially similar to the federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, and that cases construing the FCA are also relevant to the construction and interpretation of the FCO. Mem. at 7, ECF No. 30; Resp. at 7, ECF No. 47 ("Relator agrees with Redflex that the Court should follow federal False Claims Act case law and standards."). *Cf. Scachitti v. UBS Fin'l Servs.*, 215 Ill. 2d 484, 831 N.E.2d 544, 557-58 (2005) (noting that Illinois' Whistleblower Reward and Protection Act—now known as the Illinois False Claims Act—"closely mirrors the Federal False Claims Act" and following Supreme Court's interpretation of the federal FCA to resolve question of proper interpretation of the state act); *People ex rel. Schad, Diamond & Shedden, P.C. v. QVC, Inc.*, 2015 IL App (1st) 132999, ¶ 30, 31 N.E.3d 363, 371 (Ill. App. 2015) ("Illinois courts have relied on federal courts' interpretation of the federal False Claims Act (31 U.S.C. § 3730 (2012)) for guidance in construing the Illinois False Claims Act."). That said, in the wake of amendments to the FCA in 2010, the text of the FCA is no longer identical to that of the FCO, raising questions about the relevance of some post-2010 cases construing the FCA in interpreting the FCO. Several such issues are discussed *infra* at notes 6 and 7.

brought by the Attorney General once the private person has been determined to lack the jurisdictional prerequisites for suit"). Thus, notwithstanding the jurisdictional nature of this motion, and regardless of its outcome, the case will go forward.[4]

That said, one might wonder about the point of Redflex's motion. If the case goes forward no matter, what is the point? Whether the FCO claim goes forward with, or without, Rosenberg will make little, if any, difference in the prosecution of this case. The City has taken the lead and will control the presentation of the case at trial and the conduct of discovery before trial. *See* Chicago Mun. Ord. 1-22-030(c)(1) (the City "shall have the primary responsibility for prosecuting the action, and shall not be bound by an act of the person bringing the action"). Rosenberg's attorneys may provide some useful assistance, but they can do so whether Rosenberg is a party or not. And Rosenberg's status as a party, of course, has no bearing on his role as a witness in the case.

Redflex's motion appears to be animated, at least in part, by its view—evident in its briefs—that Rosenberg is now seeking to profit from the actions he took that caused the company to lose hundreds of millions of dollars in business and exposed it to substantial potential liability in this lawsuit. Reading Redflex's briefs, it is difficult to avoid the conclusion that its primary purpose is to deny Rosenberg any portion of a future damage award. *See, e.g.*, Reply at 1, ECF No. 52 ("after directly participating in the alleged fraud for years and lying repeatedly to RTSI's attorneys about his and others' misconduct for years, Rosenberg finally divulged limited information about his actions"). While Rosenberg's presence or absence as a party will not affect the amount of any damage award Redflex may ultimately be required to pay,

---

[4] Redflex, moreover, has answered, rather than challenged, the City's amended complaint, so all of the claims the City has asserted, including the FCO claim, are going forward. For this reason, and as discussed in more detail below at 34-35, Redflex's alternative motion to dismiss Rosenberg's complaint for failure to state a claim is moot.

Rosenberg will not be entitled to *any* share of that damage award if he is dismissed from the case based on the public disclosure bar.[5] The ruling Redflex seeks would render Rosenberg's participation in the case void *ab initio*.

That does not mean, however, that Redflex has no reason to contest Rosenberg's participation in this case. While his share of a damage award would not increase Redflex's exposure, his entitlement to recover reasonable attorney's fees would. Under § 1-22-030(d)(3) of the FCO, the relator is entitled to recover, *inter alia*, reasonable attorneys' fees and costs even if the City has intervened. Thus, the defendants have a legitimate basis to seek to dismiss Rosenberg from the case; while Rosenberg's fees post-intervention should presumably be modest in view of the limited role his counsel will play, the fees incurred pre-intervention are likely to be much more significant. Whatever its motives, then, Redflex has a reasonable basis to challenge Rosenberg's status as "a person bringing the action." Onward, then, to the substance of the motion.

### A. Public Disclosure Bar

The principal issue presented by the defendants' motion is whether the "public disclosure bar" applies to Rosenberg. The City's FCO expressly denies jurisdiction[6] to any court over an action

---

[5] Under the FCO, like the FCA, the share of an award that would otherwise go to a relator may be reduced "if the court finds that the action was brought by a person who planned, initiated or participated in the violation . . . upon which the action was brought . . . ." Ch. Mun. Ord. 1-22-030(d)(4).

[6] Until 2010, the FCA also stated expressly that the public disclosure bar is jurisdictional and the Supreme Court confirmed as much in *Rockwell*. *See* 549 U.S. at 468 ("a clear and explicit *withdrawal* of jurisdiction [undoubtedly] withdraws jurisdiction") (emphasis in original). In 2010, however, Congress amended § 3730(e)(4) and replaced the statement "no court shall have jurisdiction" with "the court shall dismiss an action or claim under this section." In *Cause of Action,* the Seventh Circuit left open the question whether the 2010 amendment to the FCA changed the analysis of whether the public disclosure bar is "jurisdictional," but noted that other

> based upon the public disclosure of allegations or transactions . . . in a
> legislative, administrative, or Inspector General's report, hearing, audit,
> or investigation, or from the news media, unless the action is brought by
> the corporation counsel or the person bringing the action is an original
> source of the information. . . . "[O]riginal source" means an individual
> who has direct and independent knowledge of the information on which
> the allegations are based and has voluntarily provided the information to
> the city before filing an action under this section which is based on the
> information.

Chi. Mun. Code § 1-22-030(f).[7] Whether allegations have been publicly disclosed within the

meaning of the public disclosure bar, or whether a relator qualifies as an original source, are

questions of law. *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 913 (7th Cir. 2009).

Redflex maintains that Rosenberg cannot act as Relator in this case because the bribery

scheme alleged in his complaint had already been "publicly disclosed" within the meaning of the

---

circuits that have addressed the issue have concluded that the post-2010 version of the bar is not
jurisdictional. 815 F.3d at 271 n.5. The Seventh Circuit has since described the rule as
jurisdictional, however, citing *Rockwell* but failing to address the 2010 amendment to the
statutory language. *See United States ex rel. Sheet Metal Workers Int'l Assoc., Local Union 20 v.
Horning Investments, LLC*, — F.3d —, 2016 WL 3632616, *3 (7th Cir. July 7, 2016). Further
complicating the matter, the Seventh Circuit has held that the 2010 amendments to the public
disclosure bar are not retroactive. *Id*. at 272 n.6. Thus, in a case where the conduct at issue spans
the 2010 amendment, some portion of the claim could be subject to a jurisdictional bar while
another would not be. *See Bogina,* 809 F.3d at 368-69 (noting cases that hold that "the pre-2010
version of the statute governs conduct that occurred in that era while the new version governs
only more recent conduct"). It is not necessary in this case, however, to work through the puzzles
presented by the 2010 amendment to the FCA's "jurisdictional" language, because no similar
amendment has been made by the City to its ordinance. The FCO retains its language making the
public disclosure bar jurisdictional and, accordingly, the Court will treat it as such.

[7] The definition of "original source" under the FCA was the same until amended in 2010;
the FCA now defines an "original source" as someone who "has knowledge that is independent
of and materially adds to the publicly disclosed allegations." 31 U.S.C. § 3730(e)(4). The
Seventh Circuit has held that the 2010 amendment to the FCA's original source definition
clarified rather than changed the meaning of that term. *See United States ex rel. Bogina v.
Medline Indus., Inc.*, 809 F.3d 365, 368 (7th Cir. 2016) (explaining that a source has "direct and
independent knowledge" when the source "has knowledge that is independent of and materially
adds to the publicly disclosed allegations"). Accordingly, post-amendment case law construing
the term, like *Bogina,* remains relevant notwithstanding the lack of a similar amendment to the
City's definition. Further, because the Court's ruling is predicated on the absence of voluntary
disclosure, a requirement that survived the 2010 amendment to the FCA, the import of the
change to the other components of the "original source" definition does not matter.

FCO and Rosenberg does not qualify as an original source of the information on which his complaint is based because he did not voluntarily provide information to the City. Rosenberg contends that the details of the red-light bribery scheme disclosed in his complaint had never been publicly disclosed and that in any event he qualifies as an original source of the disclosed allegations because he has personal knowledge of the scheme and voluntarily supplied the information to the City when he met with representatives of the City's OIG on February 4, 2013—well before he filed his complaint and before most of the allegations concerning the DARLEP bribery scheme entered the public domain.

The Seventh Circuit has described the inquiry to determine whether the public disclosure bar applies as "a three-step analysis." *Cause of Action v. Chicago Transit Auth.*, 815 F.3d 267, 274 (7th Cir. 2016). First must be determined whether the allegations in the complaint have been "publicly disclosed" through one of the channels enumerated in the statute. *Id*. If so, it must then be determined whether the relator's lawsuit is "based upon," *i.e.,* whether it is "substantially similar to," those publicly disclosed allegations. *Id*. If it is, the public-disclosure bar precludes the suit unless the relator is an "original source" of the information. *Id*. The first and third steps, however, each require subsidiary inquiries. The public disclosure determination "presents two distinct issues: whether the relevant information was 'placed in the public domain,' and, if so, whether it contained the 'critical elements exposing the transaction as fraudulent.'" *Id.* (quoting *United States ex rel. Feingold v. AdminaStar Fed., Inc.*, 324 F.3d 492, 495 (7th Cir. 2003)). As for the original source inquiry, it requires that the source have voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, § 3730(e)(4)(B)(i), or have "direct and independent knowledge of the information on which the

relator's allegations are based[8] (which is to say that the relator's knowledge is both "independent of" and "materially adds to" the publicly disclosed allegations, *Bogina*, 809 F.3d at 368) and that the source have voluntarily provided that information to the City before filing the action, § 3730(e)(4)(B)(ii). *See Cause of Action*, 815 F.3d at 282-83. The would-be relator bears the burden of proof as to all of these inquires. *Id.* at 274; *Glaser*, 570 F.3d at 913. Thus, it is Rosenberg's task to show that he is not subject to the public disclosure bar.

*1. Public Disclosure*

"[A] public disclosure occurs when the critical elements exposing the transaction as fraudulent are placed in the public domain." *Glaser*, 570 F.3d at 913 (internal quotation marks omitted). This is true even if those elements stop short of stating an allegation of fraud expressly or even compelling an inference of fraud; it is enough that the public disclosures raise a possibility of the submission of false claims that would be sufficient to prompt the government to investigate. *Cause of Action,* 815 F.3d at 276 (holding disclosure of "possible improprieties" sufficed for public disclosure bar where information was sufficient to prompt responsible authority to undertake an investigation); *Bogina*, 809 F.3d at 370 (liability where government was previously on notice of "possibility" of alleged kick-back scheme and could have pursued it based on the information it possessed); *Glaser*, 570 F.3d at 909 (government's awareness of "possible improprieties" in defendants billing practices, which had given rise to an investigation, sufficient to invoke public disclosure bar).

Our marker in this analysis is April 15, 2014, the date that Rosenberg filed his complaint. The FCO's public disclosure bar withholds jurisdiction over any suit based upon information that

---

[8] *Rockwell*, 549 U.S. at 470-72 (holding that the phrase "information on which the allegations are based" refers to the information on which the relator's allegations, rather than the publicly disclosed allegations, are based).

was publicly disclosed (as that term is defined) before that date unless the putative relator qualifies as an original source of the information.

There can be no serious dispute that by April 15, 2014, extensive allegations about the DARLEP bribery scheme had been publicly disclosed and that those allegations included information "exposing the transaction as fraudulent." As Redflex's motion details, by that time there had been dozens of articles relating to the scheme and RHI had itself issued press releases and disclosures to the Australian National Stock Exchange detailing the results of its internal investigation.[9] In addition, the City had been conducting an investigation of the scheme since at least mid-October 2012 and the federal government's investigation had been ongoing since sometime in February 2013, at the latest. Given this wealth of information, the central, critical allegations exposing the DARLEP bribery scheme clearly had already entered the public domain by the time Rosenberg filed his complaint.

Rosenberg argues that disclosures by Redflex through the Australian stock exchange releases it issued do not constitute "public disclosures" that implicate the disclosure bar because they are not amount the specifically enumerated types of disclosures identified in the FCO and

---

[9] Redflex's motion presents a factual challenge to jurisdiction, *i.e.,* it contends that "there is in fact no subject matter jurisdiction notwithstanding the adequacy of the pleadings. "In reviewing a factual challenge, the court may look beyond the pleadings and view any evidence submitted to determine if subject matter jurisdiction exists." *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). Rosenberg does not dispute the fact of the publication of these articles and releases, and in any event the Court may take judicial notice of the fact of publication and the content of the articles (as distinguished from the truth or accuracy of their content). *See, e.g., Ennenga v. Starns*, 677 F.3d 766, 773–74 (7th Cir. 2012) ("A court may take judicial notice of facts that are (1) not subject to reasonable dispute and (2) either generally known within the territorial jurisdiction or capable of accurate and ready determination through sources whose accuracy cannot be questioned."); *Bardney v. United States*, 151 F.3d 1032 (7th Cir. 1998) ("As it is indisputable that the articles were in fact published, the existence of the articles was a proper subject for judicial notice.").

because foreign disclosures cannot trigger the bar. Section 1-22-030(f) identifies only three types

of disclosures that trigger the disclosure bar: (1) a "criminal, civil, or administrative hearing"; (2)

"a legislative, administrative, or Inspector General's report, hearing, audit, or investigation"; or

(3) "the news media." As for the argument that "foreign" disclosures do not satisfy the

enumerated criteria, Rosenberg cites only *United States ex rel. Yannacopolous v. General

Dynamics*, 315 F. Supp. 2d 939, 948 (N.D. Ill. 2004) for that proposition, but that case addressed

a foreign proceeding under seal—*i.e.,* proceedings that were ***not*** publicly disclosed.[10] As for the

question of whether Redflex's public securities filing satisfies the disclosure criteria, Redflex

cites a number of district court decisions holding that securities filings, company press releases,

and information available on company web sites are included within the ambit of public

disclosures. There is, however, no need to resolve definitively either of these questions in this

case. Whether or not the Redflex ASX release was itself a "public disclosure" within the

meaning of the FCO, the fact and content of that release were promptly reported by the Chicago

Tribune in its March 4, 2013 edition. ***That*** report unquestionably qualifies as a domestic report

by the news media, and so constitutes a public disclosure of the information set forth in the

release.

   In addition, it also bears noting that Redflex's disclosure of the results of its internal

investigation to the City's OIG also constitutes a "public disclosure" of that information under

Circuit precedent. The Seventh Circuit has held that because "the purpose of a public disclosure

is to alert the responsible authority that fraud may be afoot, the Government's possession of the

---

[10] In *Yannacopolous,* the court's holding was also premised on the notion that, if public disclosure was interpreted to extend to foreign proceedings, a corporation "could avoid FCA prosecution . . . by arguing that a foreign government investigated the matter." 315 F. Supp. 2d at 948. That rationale is not persuasive; the public disclosure bar operates only against would-be relators, not against the government. Disqualification of the relator has no adverse effect on the government's ability to pursue a claim.

information exposing a fraud is alone sufficient to trigger the public-disclosure bar." *Cause of Action*, 815 F.3d at 275 (internal quotation marks omitted). Although "mere governmental awareness of wrongdoing does not mean a public disclosure occurred," *Glaser*, 570 F.3d at 913, disclosure is deemed to have occurred where the government's knowledge is accompanied by efforts to investigate or remedy the fraud. *Cause of Action*, 815 F.3d at 276 (agency's investigation prior to communication from whistleblower constituted public disclosure).[11] Here, there is no dispute that the City was actively investigating the DARLEP contracts based on the Tribune's initial reports in October 2012; Rosenberg acknowledges that he met with the City's investigators and based on the OIG's investigation, the City ultimately terminated its relationship with Redflex. Nor is there a dispute that Redflex shared with the OIG the results of its own investigation by permitting its outside counsel to brief City IG officials on the results of the company's internal investigation. The Lassar affidavit confirms that Sidley Austin disclosed to the City the arrangements by which it was "likely" that Bills had been taking bribes to deliver the red light camera program to RTSI. Thus, that disclosure also constitutes a public disclosure within the meaning of the FCO.

Putting aside the pointless argument concerning the ASX release, Rosenberg does not really contest that there were public disclosures about the bribery scheme before he filed his complaint. Instead, Rosenberg's brief erroneously conflates the questions of whether there was public disclosure and whether the complaint was "based upon" publicly disclosed information, construing both as turning on the question of whether the information alleged in the complaint

---

[11] In *Cause of Action*, the Seventh Circuit considered but did not adopt the view of some other circuits requiring that a "public disclosure" requires, in addition to government knowledge and investigation, "there be some act of disclosure to the public outside of the government." *See* 815 F.3d at 276-277. Even were that rule to apply, in this case there has clearly been, by virtue of the Tribune's extensive press coverage, disclosure outside the government.

was "substantially similar" to information in the public domain. *See, e.g.*, Resp. at 11, ECF 47 ("Because the 'first step' in determining whether the complaint's allegations are substantially similar to the public disclosures has not been met, the Court need not and should not proceed to the 'second step,' *i.e.*, whether the Complaint is actually 'based upon' the publicly disclosed information."). As discussed below, however, the "based upon" inquiry is where the question of substantial similarity fits into the public disclosure bar analysis; "substantial similarity" is not a consideration in identifying the information that was in the public domain before the relator's complaint was filed.

### 2. Suit "based upon" publicly disclosed information

Rosenberg's principal argument is not that there was not information about the bribery scheme in the public domain, but that the information in the public domain was not substantially similar to the information he supplied in his complaint. The public disclosure bar is implicated only where suit is "based upon" allegations that have been publicly disclosed. "[A] lawsuit is based upon publicly disclosed allegations when the relator's allegations and the publicly disclosed allegations are substantially similar." *Glaser*, 570 F.3d at 915.

In arguing that the allegations of his complaint are not substantially similar to the allegations that were in the public domain before he filed his complaint, Rosenberg invokes the Seventh Circuit's warning that care must be taken not to compare FCA claims and publicly disclosed allegations at a level of generality so high that meaningful distinctions between them are obscured. *See, e.g., Leveski v. ITT Educational Servs., Inc.*, 719 F.3d 818, 831 (7th Cir. 2013); *U.S. ex rel Goldberg v. Rush Univ. Med. Ctr.*, 680 F.3d 933, 936 (7th Cir. 2012). The caution is well-taken but does not help Rosenberg, because his FCO claim and the allegations about the City's DARLEP program that describe the same scheme. Before the filing of the

Rosenberg complaint, the City, its OIG, and the public knew that there was a substantial basis to believe that RTSI had won and expanded its red-light camera contract with the City through the systematic bribery of John Bills, who managed the program for the City. They knew the duration of the scheme, the principal individuals involved, the value of the bribes, and the mechanisms by which the bribes had been paid. They knew that Redflex had acknowledged the bribery scheme and that it implicated a number of the company's senior executives, that the City had barred Redflex from bidding on other projects and from renewing its DARLEP contracts based on the bribery scheme, and that a federal criminal investigation was proceeding. They knew, in short, that the entire history of the City's red-light camera program had been besotted by the corrupt relationship between Bills and RTSI.

Nevertheless, Rosenberg maintains that the information reported by the Tribune, and provided to the OIG by RTSI, lacked the specificity of the information supplied in his complaint. That contention is neither relevant nor accurate. It is not relevant because "substantially similar" does not mean "identical"; nor does "based upon" mean "solely based upon," for a "*qui tam* action even partly based upon publicly disclosed allegations or transactions is nonetheless 'based upon' such allegations or transactions. *U.S. ex rel. Heath v. Wisconsin Bell, Inc.*, 760 F.3d 688, 691 (7th Cir. 2014), citing *Glaser*, 570 F.3d at 920. To clear the substantially similar threshold, a putative relator must present "genuinely new and material information" beyond that which has been publicly disclosed. That means information that expands what is publicly known about the scheme's fraudulent nature, or its scope, objectives, duration, and the like. Anything else, as the

saying goes, "is just details,"[12] and a putative relator "is not allowed to proceed independently if he merely 'adds details' to what is already known in outline." *Bogina*, 806 F.3d at 370.

The Seventh Circuit's cases applying the substantially similar requirement bear this out. *Compare, e.g., Wisconsin Bell, Inc.*, 760 F.3d at 691 (allegations not substantially similar where they provided missing information that allowed inference of fraud to be made); *Leveski*, 719 F.3d at 829-33 (allegations not substantially similar because they spanned an entirely different time period, involved another department, and were based on different violations of applicable regulations); *Goldberg*, 680 F.3d at 935 (allegations not substantially similar because they alleged a different form of deceit), *with Cause of Action*, 815 F.3d at 282 (allegations substantially similar where they pertained to same entity and describe same fraudulent scheme of underreporting deadhead mileage by city buses); *Bogina*, 809 F.3d at 370 (allegations substantially similar where they added only details to a previously alleged kickback scheme such as an additional class of customers who received kickbacks and identified a different Medicare program targeted by the scheme); *U.S. ex rel. Ziebell v. Fox Valley Workforce Development Bd., Inc.*, 806 F.3d 946, 952 (7th Cir. 2015) (allegations substantially similar where relator described same improper practice that state agency had criticized in an audit report); *Glaser*, 570 F.3d at 920 (allegations substantially similar where they pertained to the same entity and described the same fraudulent conduct).[13]

---

[12] *Cf.* Albert Einstein (popularly attributed, but unsourced): "I want to know how God created this world. I'm not interested in this or that phenomenon, in the spectrum of this or that element. I want to know His thoughts, the rest are details."

[13] Rosenberg cites *United States ex rel. Mateski v. Raytheon Co.*, 816 F.3d 565 (9th Cir. 2016) as an example that supports his interpretation of Seventh Circuit precedent, but in that case, the Ninth Circuit reversed the district court's ruling that the public disclosure bar applied to block the relator's suit because it concluded that the complaint alleged fraud "that is different in kind and degree" from previously disclosed information in the public domain. *Id.* at 567. That is simply not the case here. The fraud alleged in the Rosenberg complaint is different in neither

Nor is Rosenberg's contention that the publicly disclosed information concerning the DARLEP bribery scheme lacked the specificity of the information supplied in his complaint accurate. The information within the public domain concerning the bribery scheme was not limited to the broad contours of the scheme. These reports were not, as Rosenberg dismisses them, merely "general questioning of the Redflex/Bills/O'Malley relationship, plus a few purported factual tidbits." They were detailed reports of allegations and information suggesting that millions of dollars were being paid by the City's red-light camera contractor to the City official responsible for overseeing that program.

Indeed, the initial allegations reported by the Tribune in October 2012 were sufficiently detailed and specific that they prompted the City to begin the OIG investigation and Redflex to conduct its own internal investigation. Based on the information that had already been publicly reported in October 2012, the City OIG issued the equivalent of a subpoena to RTSI in October 2012 clearly premised on concern that O'Malley was a conduit for bribe payments to Bills; among other information, the OIG request sought detailed information on O'Malley's work for RTSI, how he came to be hired, who else had been considered for the position, and other information that would be relevant to determine whether his employment by RTSI was bona fide.

The Tribune's reporting, and the OIG's probing, in turn led to RTSI's own internal investigation, conducted by Sidley Austin, the results of which greatly expanded the publicly available information about the bribery scheme. Rosenberg does not dispute that Scott Lassar met with, and provided information to, the OIG but argues that ambiguities in Lassar's affidavit

---

kind nor degree from the information available in the public domain; it relates to precisely the same fraudulent scheme, carried out over the same period, for the same purpose, and involving the same actors. *Mateski* provides no support whatsoever for Rosenberg's argument.

raise questions about the level of detail actually provided to the OIG. The outline of the bribery scheme provided by Sidley Austin, however, was anything but vague and ambiguous, particularly in light of the subsequent statements by Redflex and reports by the Tribune.

If specificity is the measure Rosenberg demands, consider the detail developed through RTSI's internal investigation and subsequently reported by the Tribune. Lassar reported to the OIG that RTSI's internal investigation had confirmed that Bills had initiated a bribery scheme by offering to help RTSI secure the red-light camera contract in exchange for payments from RTSI and that some portion of those payments (which totaled in excess of $2 million) had likely been funneled to Bills through O'Malley, who had been hired by RTSI specifically for that purpose. In addition, Lassar reported that there may have been another conduit for payments to Bills (specifically, Network Electric) and that RTSI had also treated Bills and O'Malley to 17 expensive trips where they stayed in luxury hotels and golfed at the company's expense. Subsequent published reports identified many of the specific individuals responsible for the company's corrupt practices; not only the value, but the timing, of the payments to O'Malley as a conduit for Bills; and the supplementation of those payments with specific lavish travel junkets. The Tribune's reports before the filing of the Rosenberg complaint even culminated in a detailed description of a secret meeting between Bills and RTSI officials, including future RTSI CEO Karen Finley, at which Bills coached RTSI before its bid submission. The article went on to describe Bills' roll in reviewing the DARLEP bids and even the fact that Bills' engineered an unprecedented result: Redflex's bid "received flawless, perfect scores from every committee member in every category." (March 25, 2013).

Rosenberg invites a comparison of the publicly disclosed information about the bribery scheme and the allegations of his complaint, but that analysis demonstrates that the principal

topics discussed in the complaint had been publicly disclosed before the complaint was filed, and

that the new information that Rosenberg supplied in his complaint was simply additional detail

about the very same bribery scheme with which any regular reader of the Chicago Tribune was

already quite familiar:

| *Rosenberg's Complaint "Road Map"* | *"Publicly Disclosed" Information*[14] |
|---|---|
| Bills' "Unlawful Pre-Bid Assistance," including details of meetings addressing particulars of what Redflex needed to do to win the bid (Compl. ¶¶ 24-40) | Tribune, Feb. 21, 2014: "Red light deal tied to secret meeting" in February 2003; Bills "spent two hours coaching us on how to win the contract, telling us how to behave, what things were going to work and what wouldn't," according to another RTSI former employee. Lassar report to OIG: Bills offered assistance to Redflex in return for payments, advising that competitor had clout and Redflex would need his assistance to win the contract. |
| Bills' "Unlawful Assistance with Field Tests" | [no public disclosures of this information identified] |
| Bills' "Unlawful Assistance With Evaluation Process"; "how Bills would get the Chicago Evaluation Committee to unanimously award Redflex the contract" | Tribune, March 25, 2013: Daley administration was warned six years ago about preferential treatment in contract awards relating to red-light camera program; Alderman alleges that the selection of RTSI and subsequent expansions of its contract "contravene open and competitive procurement required by law"; Redflex received perfect scores from every member of selection committee; Bills' listed as a government reference for Redflex while evaluating competing proposals. |
| Redflex's "Entertainment of City Officials" | Tribune articles, including …, March 3, 2013, March 4, 2013, February 21, 2014 reporting information about 17 company-paid trips for Bills including air fare, hotels, rental cars, golf outings, and meals, [super bowl] |
| Redflex's "Payoff to John Bills" including information about payment conduits through a consultant or contractor recommended by Bills (*i.e.*, O'Malley and Network Electric) | Tribune, March 3, 2013: reporting allegations by Redflex exec in 2010 that O'Malley "serves no useful function" and that payments to O'Malley were intended for Bills. Lassar report to OIG: O'Malley and possibly Network Electric were conduits for payments to Bills; Bills suggested using O'Malley. |

---

[14] The sources of information identified here are only illustrative, not exhaustive.

| Rosenberg's Complaint "Road Map" | "Publicly Disclosed" Information[14] |
|---|---|
| Redflex's "Expansion of Original Contract" | Tribune, March 25, 2013: Bills advises ASC that City's contract with Redflex had been made exclusive without notice; bulk of funds paid to O'Malley paid beginning in 2007 when red-light program blossomed. Tribune, February 21, 2014: Bills steered red light contract to RTSI and oversaw its decade long expansion; Bills' corrupt relationship with RTSI "grew a trial project at two Chicago intersections into the largest traffic camera enforcement program in the country." |
| Redflex's "Payoff for Extension of Contract," including payments to Bills through O'Malley through retirement in 2011 | [no public disclosures of this information identified] |
| "Bills' Post-Employment Assistance," including hiring by Resolute Consulting/Traffic Safety Coalition at the request of Redflex | Tribune, March 3, 2013: Bills resigned from the City and took a consulting job with Resolute Consulting, a company funded by Redflex. Tribune, February 8, 2013: same. |
| Involvement and knowledge of senior Redflex executives | Tribune, February 21, 2014: team of five Redflex officials, including future CEO Karen Findley, attended a secret meeting with Bills; "six top Redflex officials were jettisoned" in the wake of the bribery investigation. Tribune, January 23, 2014: Rosenberg files counterclaims asserting that he was "carrying out orders" and that RTSI made him a scapegoat for company's longstanding practice of providing government officials with lavish gifts and bribes." Tribune, March 4, 2013: Redflex internal investigation concludes that executives provided clearly inadequate oversight and "inaccurate and misleading" information to the City in response to initial report of inappropriate relationship between Rosenberg and Bills. Tribune, March 3, 2013: reporting allegations by Redflex executive in 2010 that the "level of insider fraud" at Redflex would "take down the contract" with Chicago. Lassar report to OIG: CEO approved some of the payments to Bills. |

As this comparison reflects, the nature, scope, duration, value and operation of the

bribery scheme were included in the public domain before Rosenberg filed his complaint. The

only aspects of the scheme that Rosenberg identified that did not appear in public reports prior to

the filing of the complaint are some of the details about how Bills actually ensured RTSI would

win and expand its contracts with the City (though a great deal of detail about the operation of

the scheme was also in the public domain before Rosenberg filed his complaint). None of the

press reports, for example, include specific information about how Bills rigged field evaluations

to favor RTSI. But that sort of information is mere detail; it adds nothing to the basic story that

Redflex was bribing Bills, through payments funneled through O'Malley and the provision of

lavish junkets, to secure and grow its red-light camera business in the City. The Rosenberg

complaint simply did not reveal any information that added any new allegations or transactions

that were involved in the DARLEP bribery scheme; the fraudulent nature of the relationship

between RTSI and Bills had been known for a year and a half when Rosenberg filed his

complaint, and his pleading did not expand the scope, objectives, or other fundamental aspects of

the scheme.

Perhaps for that reason, Rosenberg also insists that "he is the source of the detailed

information in the Complaint." Resp. at 12, ECF 47. Even assuming that claim to be true (and

there seems little reason to doubt it, given Rosenberg's undisputed participation in the bribery

scheme), it is misplaced in the context of considering whether the complaint is "based upon"—

that is, "substantially similar"—to information in the public domain. In asserting this point,

Rosenberg again confuses and conflates the distinct steps of the public disclosure bar analysis.

What Rosenberg seeks to do is establish that his own knowledge was not based upon publicly

disclosed information, but that fact is relevant only to the question of whether Rosenberg

qualifies as an "original source" of the information in the complaint; the Seventh Circuit has

ruled that it has no bearing on the question of whether the complaint is "based upon" publicly

disclosed information. *Glaser*, 570 F.3d at 916-17 (rejecting dictionary definition of "based upon").

### 3. Original Source

Because the allegations and transactions in the Rosenberg complaint are based upon—that is, substantially similar to—information that was within the public domain, Rosenberg may act as relator only if he qualifies as an "original source" of the information. "[O]riginal source means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the city before filing an action under this section which is based on the information." Chic. Mun. Ord. 1-22-030(f). Redflex does not meaningfully argue that Rosenberg does not have "direct and independent knowledge" of the bribery scheme (how could it when it contends that Rosenberg orchestrated the scheme?). Instead, Redflex contends that Rosenberg does not qualify as an original source because he did not disclose information about the DARLEP bribery scheme voluntarily, but only after investigations by the City and by federal law enforcement authorities were under way. Whether Rosenberg qualifies as an original source, then, turns on two related questions, one factual and one legal: whether Rosenberg provided information to the City only in the course of its investigation and whether that fact counts for anything in assessing whether his disclosures to the City were "voluntary" for purposes of the original source rule.

To begin, it is only Rosenberg's disclosures to the City that are relevant to the original source inquiry. That is because this case involves the City's False Claim ordinance, not the federal False Claims Act. Per the definition of "original source," the voluntary disclosure must have been made "to the city"; there is no basis to conclude that a voluntary disclosure to the federal government would qualify one as an original source of information on which a claim

under the municipal ordinance was based. Moreover, although Redflex emphasizes that Rosenberg obtained immunity from criminal prosecution from the U.S. Attorney in exchange for his disclosure of information in the federal criminal investigation, it is undisputed that the U.S. Attorney had not granted Rosenberg immunity before Rosenberg met with City OIG on Feb. 4, 2013. Because that meeting predated the federal grant of immunity, Rosenberg's subsequent disclosures to the federal government are irrelevant to the question of whether he is an original source.

Rosenberg's submissions omit any discussion of how or when the initial contact between the OIG and Rosenberg's counsel was made. Rosenberg's narrative begins with his counsel's averment that in a call with representatives of the City's OIG on January 17, 2013, he reported that Rosenberg "intended to fully cooperate in providing them with information regarding Redflex's relationship with the City," and would "voluntarily submit to an interview with them." Williams Aff. ¶ 3. The date for an interview was subsequently arranged, and Rosenberg met with the City's OIG representatives on February 4, 2013, in Williams' office in California. In the days leading up to the interview, OIG sent Rosenberg and Williams a copy of an "Advisement" which informed Rosenberg, among other things, that "this interview is part of an official investigation"; that he had "a duty to cooperate with the [OIG]"; and that his statements, and any evidence identified based on his statements, could not be used against him in a criminal proceeding. Williams' affidavit attests that Rosenberg did not seek such an "Advisement" or condition his participation in the interview on any protection or condition expressed in the Advisement.

Redflex maintains that the disclosures Rosenberg made during the meeting with the OIG were not voluntary because the information was provided in the context of the City's investigation: "Rosenberg waited for almost a decade to reveal information about the alleged

bribery scheme to the government. When he finally disclosed certain information about what he knew, he did so in an interview in connection with an already pending investigation." And at the time, the City maintains, Rosenberg—still at that time an employee of a City contractor—was under a legal duty—*see* Chicago Mun. Ord. § 2-56-090—to cooperate with the City's investigation relating to malfeasance in connection with that contract, a fact that further undermines Rosenberg's contention that he provided information to the City voluntarily.

Although the Seventh Circuit has not addressed the question (at least so far as the parties or the Court have been able to determine), other courts have affirmed the position that providing information to government investigators in response to their investigative efforts does not qualify as "voluntarily" providing information within the context of a *qui tam* suit, for the simple reason that the purpose of a *qui tam* statute is "to encourage private individuals who are aware of fraud against the government to bring such information forward at the earliest possible time and to discourage persons with relevant information from remaining silent." *United States ex rel. Barth v. Ridgedale Elec., Inc.*, 44 F.3d 699, 704 (8th Cir. 1995). In light of that objective, in *Barth*, the Eighth Circuit held that the relator had not voluntarily disclosed information to the government when he provided information requested by a government investigator who had contacted him. Rewarding individuals for sitting on information for years before finally offering it up at the instance of a government investigator, the circuit court concluded, "is outside the intent of the Act." *Id.* Consistent with this view, the Third Circuit held in *United States ex rel. Paranich v. Sorgnard*, 396 F.3d 326, 340-41 (3d Cir. 2005) that a putative relator does not, consistent with the policy underlying *qui tam* actions, "voluntarily" provide information to the government where the government has identified the putative relator as being involved in the fraudulent activity and has initiated contact with a subpoena demanding information fundamental to the

putative relator's action, even where the relator ultimately provided more information than the subpoena sought. *See also, e.g., Prather v. AT&T,* 996 F. Supp. 2d 861, 870 (N.D. Cal. 2013) (relator who provided information only in response to request from representative of the Attorney General did not voluntarily disclose the information).

The logic of these cases is compelling and Rosenberg offers no contrary argument or authority; indeed, his briefs (which include a surreply) barely address the issue of the voluntariness of his disclosures to the City. Rosenberg devotes what little attention he pays to this issue to arguing that he didn't condition his participation in the interview on receipt of any legal protections, but he does not claim that he initiated the contact with the OIG or dispute that the format under which he disclosed information to the OIG was an interview (to which he "submitted") conducted by government officials as part of an investigation by the City. Nor, of course, can Rosenberg dispute that although he had knowledge of the bribery scheme for many years (by virtue of his direct participation in that scheme), he did not disclose information about that scheme until the City had launched its investigation. In light of these undisputed facts, it can only be concluded that Rosenberg disclosed information to the City only after he had been exposed and even then only in response to the City's initiative. As the *Barth* and *Paranich* courts concluded, one who sits on information about fraudulent conduct for years and coughs it up only when the government comes knocking does not qualify as an "original source" of information about that fraud because such a disclosure cannot be considered voluntary. To hold otherwise would substantially undermine the efficacy of the incentives *qui tam* statutes offer.

Because the Rosenberg complaint was based on publicly disclosed information and Rosenberg is not an original source of the information in the complaint, the motion pursuant to Rule 12(b)(1) to dismiss Rosenberg from this case for lack of jurisdiction is granted.

### B. False Statements vs. False Claims

Rosenberg styled his original claim as a *qui tam* action on behalf of the City under the FCO. Redflex asserts, however, that Rosenberg's claim is actually a claim under the City's False ***Statements*** Act, not the False ***Claims*** Act, and moves pursuant to Rule 12(b)(6) to dismiss Rosenberg's claim on that basis because the City's False Statements Act does not authorize *qui tam* suits while the FCO does. RTSI argues that Rosenberg's theory of liability is premised not on the submission of ***claims*** for payment that are themselves false, but rather on ***statements*** that were false in the EDS's that RTSI was required to sign as a condition of contracting with the City.

The City's False Statements ordinance finds no parallel in the FCA. It prohibits a "false statement of material fact to the city" and includes statements of material fact "made in connection with a bid, proposal, contract or economic disclosure statement of affidavit." By negative implication, RTSI argues, that sort of false statement lies outside the ambit of the falsehoods prohibited by the City's False Claims ordinance, which prohibits only false statements "to get a false or fraudulent claim paid or approved by the city." RTSI acknowledges that under the federal FCA, "statement" is construed broadly to reach statements that foreseeably cause or facilitate later false claims, but according to RTSI, the City's False Statements Act would be superfluous if the FCO were interpreted as broadly as the FCA. Although the City did not take a position on Redflex's argument with respect to the application of the public disclosure bar, it filed a "position paper" disputing Rosenberg's take on the interplay between the City's

two statutes, arguing that Redflex's interpretation is overly narrow and conflicts with federal false claim law.[15]

There is, however, no need to resolve this dispute—at least at present. Whether Rosenberg remains the relator or not, his complaint was superseded by the First Amended Complaint filed by the City when it intervened in this suit. Rosenberg's FCO claim is therefore a nullity. And although the City's amended complaint also asserts a claim based on the FCO, there is, as the City points out, no challenge pending to that claim. Redflex answered that claim (and all the others asserted in the FAC) rather than asserting that there is no valid FCO claim, so there is no present challenge to Count 1 of the FAC. Consistently, Redflex's brief expressly states that Redflex's motion does not seek dismissal of any of the causes of action set forth in the City's FAC. Accordingly, to the extent that Redflex's motion targets the FCO claim set forth in the Rosenberg complaint, it is denied as moot. And there being no challenge to the FCO claim set forth in the FAC, the Court leaves to another day the question of whether the existence of the FSA has any implications for the scope of the FCO.

*      *      *

Dated: August 8, 2016

_____
John J. Tharp, Jr.
United States District Judge

---

[15] The parties briefed this issue before the Supreme Court issued its opinion in *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S.—, 136 S. Ct. 1989 (2016), holding that the "implied certification" theory presents a valid basis for liability under the FCA where a request for payment includes specific representations about the goods or services provided and the failure to disclose noncompliance with material statutory, regulatory, or contractual requirements renders the representations misleading, *id.* at 2001, and that such resulting misrepresentation be material to the government's payment decision, *id.* at 2003-2004.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| CITY OF CHICAGO *ex rel.* AARON ROSENBERG, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 15 C 08271 |
| REDFLEX TRAFFIC SYSTEMS, INC. AND REDFLEX HOLDINGS, LTD., | ) ) ) | Judge John J. Tharp, Jr. |
| Defendants. | ) ) | |

## ORDER

For reasons explained in the Statement below, this Court denies the motion [86] of Aaron Rosenberg and his attorneys for (i) payment of a share of the settlement proceeds; and (ii) for attorneys' fees and costs under the statute or a *quantum meruit* theory. This case remains closed.

## STATEMENT

Aaron Rosenberg filed this civil action on behalf of the City of Chicago under its False Claims Ordinance ("FCO"), Chicago Mun. Code ch. 1-22. Rosenberg, a corrupt former executive of Redflex Traffic Systems, Inc. ("RTSI") from 2002 to February 2013 alleged that RTSI violated the FCO by using bribery to obtain contracts with the City to provide and maintain its digital automated red-light camera enforcement program. The City intervened and filed an amended complaint against RTSI and its parent company, Redflex Holdings, Inc. ("RHI") (collectively, "Redflex"). Granting Redflex's motion, this Court dismissed Rosenberg from the suit because the allegations in his complaint were based upon publicly disclosed information and he does not qualify as an original source of those allegations. *See* Mem. Op., ECF No. 63. The City and Redflex have since settled this matter and dismissed the lawsuit voluntarily, over Rosenberg's objections. *See* Agreed Mot., ECF. No. 78; Relator Objections, ECF No. 82; Order, ECF No. 85.

Rosenberg now moves to share in a portion of the settlement proceeds and for an award of attorneys' fees for his lawyer's contributions to the case. The City and Redflex each oppose the motion.[1]

---

[1] The Court is addressing this non-emergency motion on an expedited basis in deference to the Court of Appeals, which deems the resolution of this motion relevant to its consideration of Appeal No. 17-1524, in which Rosenberg challenges his dismissal as relator.

A.      Settlement Proceeds

Before this motion was filed, at a hearing on Rosenberg's objections to the settlement, the Court had already expressed it skepticism that Rosenberg could share in any portion of the proceeds. Feb. 9 Tr. 3, 5-6, ECF No. 100. Based upon the holding of *Rockwell International Corporation, et al. v. United States*, 549 U.S. 456 (2007), that the public-disclosure bar of the federal False Claims Act (identical in all material respects to the FCO) is a matter of the court's subject-matter jurisdiction, this Court explained that because of its ruling on the public-disclosure bar: "Mr. Rosenberg's participation in the case prior to that ruling is a nullity. It is void *ab initio*. It has no effect. He is no longer and effectively was never authorized to bring the case. The Court never had jurisdiction." Tr. 3. Thus Rosenberg "has no claim on any settlement proceeds or damages that might ultimately be awarded in this case." *Id*. 5. Nevertheless, the Court permitted the filing of the current motion because Rosenberg's attorneys orally advanced an argument that *Rockwell* did not foreclose the relator's argument because it spoke about proceeds due to a "party," which Rosenberg is not, as opposed to a "person bringing the action" under the statute, which Rosenberg contends that he is. Despite Rosenberg's linguistic gymnastics, however, the Court remains unpersuaded after reviewing the argument in writing.

The Court first notes that Rosenberg's motion, which was filed after the hearing on February 9, does not address the principal concern the Court identified during that hearing—namely, that it lacks jurisdiction to do anything with respect to Rosenberg, including to award proceeds and fees. The failure to address the jurisdictional issue in the motion—which this Court permitted for the very purpose of letting Rosenberg set forth his theories of relief—is a forfeiture of any argument that such jurisdiction exists. *See James v. Hyatt Regency Chicago*, 707 F.3d 775, 783 (7th Cir. 2013) (arguments not raised in the district court are waived). Objections to the exercise of subject matter jurisdiction, of course, cannot be forfeited, but "the *proponent* of subject matter jurisdiction, as with any party with the burden on a particular point, may forfeit an argument that could have been made to *support* jurisdiction. *Bgc Partners, Inc. v. Avison Young (Canada) Inc.*, No. 15 C 3017, 2015 WL 7251954, at *4 (N.D. Ill. Nov. 17, 2015).

If Rosenberg wishes to stand on his cursory remarks at the February 9 hearing, that is a poor decision. Then, Rosenberg appealed to this Court not to bar him from recovery based on the absence of jurisdiction, urging that *Rockwell* does not apply because he is not acting as a "party" seeking a share of the proceeds, only a "person" who initiated the lawsuit. Feb. 9 Tr. 4, ECF No. 100. But both the FCA and the FCO speak of the relator as "the person bringing the action," not a "party." For example, the public-disclosure bar and original-source exception refer to "the person bringing the action," as does the statutory section providing that the "person bringing the action" (a.k.a., the relator) can receive proceeds. And the *Rockwell* Court squarely decided the construction of that very statute, so any argument that it does not apply here is not well-taken. Of course, a relator (who in any false-claims *qui tam* case is the person "bringing the action") is, necessarily, a "party" in the case at filing. For purposes of the jurisdictional bar, this doesn't matter. Once dismissed, he remains a "person," but he is no longer the "person bringing the action," nor the relator, nor a party—effectively, he never was, because jurisdiction was never vested. This is the point of *Rockwell*. "The elimination of [the relator] leaves in place an action pursued only by the Attorney General, that can reasonably be regarded as being 'brought' by him." 549 U.S. at 478.

The consequence is that the ex-relator whose claim is jurisdictionally barred cannot receive any share of the proceeds attributable to that claim. *United States ex rel. Newell v. City of St. Paul*, 728 F.3d 781, 799 (8th Cir. 2013); *see also United States ex rel. Bledsoe v. Community Health Systems, Inc.*, 342 F.3d 634 (6th Cir. 2003) (relator possibly entitled to share in settlement proceeds if amended complaint survived Rule 9(b) *and* the district court "is satisfied that it has subject matter jurisdiction over the FCA claims"). Rosenberg offers no way around this jurisdictional impediment to his claim, and the Court will not belabor further the points it made on the record on February 9.

Rosenberg's statutory argument is also unpersuasive. The FCO, Title One, Chapter 22, Section 30(d)(1) states:

> If the city proceeds with **an action brought by a person under this section**,[2] such person shall, subject to the second sentence of this paragraph, receive at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim, depending upon the extent to which the person substantially contributed to the prosecution of the action. Where the action is one which the court finds to be based primarily on disclosures of specific information (other than information provided by the person bringing the action) relating to allegations or transactions in a criminal, civil, or administrative hearing, in a legislative, administrative, or inspector general's report, hearing, audit, or investigation, or from the news media, the court may award such sums as it considers appropriate, but in no case more than ten percent of the proceeds, taking into account the significance of the information and the role of the person bringing the action in advancing the case to litigation.

Rosenberg preserves for appeal, but does not belabor, his argument that the first sentence applies to him. Instead he seeks a "Level 2" recovery of ten percent, pursuant to the second sentence. That sentence mirrors the pre-2010 FCA (parsed in *Rockwell*), which provides that, "if the Government proceeds with an action brought by a person under subsection (b):[3]

> Where the action is one which the court finds to be based primarily on disclosures of specific information (other than information provided by the person bringing the action) relating to allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, the court may award such sums as it considers appropriate, but in no case more than 10 percent of the

---

[2] An "action brought by a person under this section," *i.e.*, section 30, refers to a qui tam action brought by a relator on the City's behalf; *see* § 30(b)(1) (permitting actions by private persons to enforce the FCO).

[3] Again, this refers to a qui tam action brought by a private person for himself and the government. 31 U.S.C. § 3730(b)(1).

proceeds, taking into account the significance of the information and the role of the person bringing the action in advancing the case to litigation."

31 U.S.C. § 3730(d)(1). Both provisions are entitled "*Award to qui tam plaintiff.*" Of course Mr. Rosenberg is not a *qui tam* plaintiff because he was jurisdictionally barred. But that point has been made.

Rosenberg's thin statutory-interpretation argument, as the Court understands it, is that, even he is not the original source, and thus not a "party" or the "relator," he remains the "person" who brought the action under the FCO, and therefore he can still recover simply based on having filed the complaint.[4] But *Rockwell* forecloses that argument. The lawsuit is treated as though the "person" who brought it is the City of Chicago (as was the Attorney General, in *Rockwell*) because Rosenberg was jurisdictionally barred from asserting a claim on the City's behalf.

By the logic of Rosenberg's argument, *any* person could file a sham, uninformed complaint, later be dumped as the relator, and yet be entitled to seek a portion of any recovery obtained in the suit by virtue of having brought the lawsuit. That is not the law. Even the sole authority that Rosenberg relies upon begins by stating the proposition that the zero-to-ten percent recovery ("Level 2") may be obtained "*only if* the relator possessed 'direct and independent knowledge of the information' upon which the suit was based." *Alderson v. United States*, 718 F. Supp. 2d 1186, 1189 (C.D. Cal. 2010), *aff'd*, 686 F.3d 791 (9th Cir. 2012) (citing 31 U.S.C. § 3730(d)(1), (e)(4) and cases) (emphasis added). In other words, "*only if*" the original-source exception to the public-disclosure bar applies can the ex-relator collect.[5] Other cases support this view. For example, the FCA's first-to-file rule will not bar a second lawsuit on the same false claims if the first is dismissed for lack of jurisdiction. *Campbell v. Redding Med. Ctr.*, 421 F.3d 817, 825 (9th Cir. 2005) ("[W]e hold that in a public disclosure case, the first-to-file rule of § 3730(b)(5) bars only subsequent complaints filed after a complaint that fulfills the jurisdictional prerequisites of § 3730(e)(4)."). This reinforces the premise that the jurisdictional dismissal erases the relator not only from later proceedings but from everything that came before.

---

[4] Rosenberg has wisely abandoned the argument he advanced orally in court to the effect that the FCO differentiates between "a person bringing the action" and the person "initiating" the action. See 2/9 Tr. at 4:8-10, ECF No. 100 ("The Court has talked about bringing the lawsuit. The ordinance actually says person initiating the lawsuit."). There is no such distinction between the FCA and the FCO, or within the relator compensation provisions of either statute. They speak only of the person "bringing" the action. And if Rosenberg does not qualify as "the person bringing the action" because he was jurisdictionally barred from asserting the claims, that disqualification applies equally to both subsections of § 1-22-30(d)(1) of the FCO.

[5] Rosenberg's reliance on *Alderson* in support of his argument is utterly misplaced and, because it is the only authority he cites, telling. Apart from the fact that its overview of the FCA's compensation scheme for relators is *dicta*, that overview confirms that the FCA "provides three levels of recovery **to the relator.**" 718 F. Supp. 2d at 1190 (emphasis added). Yes, awards to the relator are predicated on the information and services the relator provides, but that proposition helps Rosenberg not at all because to qualify for such an award, one must be a relator. Rosenberg, jurisdictionally barred from bringing the claims asserted in his complaint, was not a relator so the statute authorizes no award. Nothing in *Alderson* suggests otherwise.

Closely on point is the Third Circuit's decision in *United States ex rel. Merena v. SmithKline Beecham Corp.*, 205 F.3d 97, 98 (3d Cir. 2000) (Alito, J.), in which the court addressed the argument that because of the public-disclosure bar, "the District Court lacked subject matter jurisdiction over the relators' automated chemistry claims; [and] therefore, the Court could not award them any recovery." *Id.* at 102. Pre-*Rockwell*, the court grounded its decision in straightforward statutory interpretation, rather than attaching dispositive weight to the "jurisdictional" nature of the public-disclosure bar. The court asked simply "whether the *qui tam* statute authorizes an award when a relator asserts a claim that is subject to dismissal under § 3730(e)(4) but the government intervenes before the claim is dismissed." *Id.* at 103. Its answer was "no." It addressed the language at issue here as to the "Level 2" recovery and held that it applied only in "the (presumably unusual) cases in which an 'original source' relator asserts a claim that is 'primarily based' on information that has been publicly disclosed and that the relator did not provide." *Id.* at 105. In other words, to recover under this provision, the "person" needs to be an original source. Therefore the appellate court ordered, on remand, that "if the District Court determines that the relators were not original sources of information with respect to those claims, *it may not award them any share of the proceeds attributable to them*." *Id.* at 108 (emphasis added). And of course the proposition makes sense: a relator who filed suit based on publicly disclosed information and was not the original source of his allegations has not provided a public service. By definition, he has earned no "bounty" (in the language of *Alderson*) by providing information of significant value.

As a further basis for denying the motion for a share of the proceeds, this Court emphasizes that the Level 2 award is wholly discretionary under the FCO: "[T]he court *may* award such sums as it considers appropriate" considering "the significance of the information and the role of the person bringing the action in advancing the case to litigation."[6] As explained in detail in the ruling that applied the public-disclosure bar and rejected the original-source exception, Rosenberg did not provide significant information that supported this lawsuit. He is seeking a windfall: completely disproportionate compensation—*millions*[7]—for drafting and filing a summary of information about which the City was already aware. Nor does post-complaint assistance merit an award. After Rosenberg filed his complaint in Cook County, the City, which had been actively investigating and had previously interviewed Rosenberg as part of its investigation, took over. Redflex had not been served at the time, and as far as this Court can determine, nothing had taken place in the litigation before the City intervened and the complaint was unsealed. Rosenberg does not claim involvement in preparing the much-expanded amended complaint of December 14, 2015, the operative pleading in this case.

And because this would be (if Rosenberg's arguments had any merit) a discretionary decision, it is also appropriate to consider Mr. Rosenberg's "role" in this case. By his own admission, he participated in Redflex's bribery scheme and lied about it for years. He received

---

[6] Rosenberg's motion maintains, wrongly, that payment of a Level 2 award is mandatory, not discretionary. Mot. 2 ("FCO mandates payment in that range"); 4 (Level 2 contributor "is *still* entitled to up to 10%") (emphasis in original), ECF No. 86.

[7] Ten percent of a $20 million settlement would be $2 million, which doesn't count the attorneys' fees Rosenberg is also seeking.

immunity from federal criminal prosecution based upon his cooperation with the investigation once it was underway. He now wants a "bounty" for attempting to enforce, on behalf of the citizens of Chicago from whom he stole, the statute prohibiting the very fraud he perpetuated. To be sure, the insider-whistleblowers who become *qui tam* plaintiffs are often erstwhile participants in the underlying fraud, just as cooperators in criminal cases who receive immunity are not saints. And if they help catch the other malfeasors or recoup the government's losses based on information that had not already been publicly disclosed, they are entitled to their due. But Rosenberg did not provide the essential information upon which this FCO case is based, and it is entirely appropriate for the Court to consider whether Rosenberg's role in the crimes he claims to have exposed should preclude, in part or whole, an "award" under the statute were one permitted. Indeed, the FCO expressly contemplates that any award otherwise appropriate under the statute may be reduced to the extent that the relator "planned, initiated or participated in the violation . . . upon which the action was brought." FCO,§ 30(d)(4). Therefore, it is bold indeed for Rosenberg to seek the maximum discretionary amount this Court may award under the FCO, even if it had jurisdiction to award it.

## B.    Attorneys' Fees

Mr. Rosenberg argues that his lawyers are entitled to fees under the FCO, and if not, under a theory of *quantum meruit*. This Court has jurisdiction over the question of fee disputes closely related to the underlying litigation. *See Elusta v. City of Chicago*, 696 F.3d 690, 694 (7th Cir. 2012).

Rosenberg's first argument for fees is based on § 30(d)(3) of the FCO, which provides that "any person" entitled to a share of proceeds under § 30(d)(1) "shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs." That argument is easily disposed of because Rosenberg is not owed a share in the proceeds. This has nothing to do with whether he is viewed a "party" or "person," to the extent that Rosenberg continues to imagine a material distinction, *see* Mem. 8, ECF No. 86. He admits that his argument is contingent on whether he "falls within Level 2 Recovery," *id.*, and so it fails. This Court need not look to the reasonableness of the fees requested.

The alternative argument on a *quantum meruit* theory is baseless. *Quantum meruit* means what is equitably deserved based on services rendered in a quasi-contractual relationship. *Dobbs v. DePuy Orthopedics, Inc.*, 842 F.3d 1045, 1049 (7th Cir. 2016) (citation omitted). Under Illinois law, to achieve a *quantum meruit* recovery against the City, Rosenberg's attorneys must prove that: (1) they performed a service to benefit City, (2) they did not provide this service gratuitously, (3) the City accepted this service, and (4) no contract existed to prescribe payment for the service. *Bernstein & Grazian, P.C. v. Grazian & Volpe, P.C.*, 402 Ill. App. 3d 961, 979, 931 N.E.2d 810, 825–26 (2010) (citations and quotation marks omitted). There is no attempt here to demonstrate that these elements are met, and Rosenberg's argument is not supported by any authority suggesting that the theory is applicable in this context.

To the extent Rosenberg's argument is premised on the time and effort expended by Mr. Rosenberg himself—*e.g*., Rosenberg "traveled from California to Chicago twice" and "met for hours with the City identifying key documents and explaining Redflex's corrupt system in

painstaking detail," Mem. 10, ECF No. 86—it is frivolous. Rosenberg cannot get "attorneys' fees" for his own time, and it is further noted that some of Rosenberg's "painstaking" account of the corruption was in relation to the criminal investigation. Further, that the City "welcomed" help from Rosenberg and his lawyers is hardly the standard for recovery in *quantum meruit*, and Rosenberg's suggestion to the contrary is equally frivolous. It is not the same thing as establishing that Rosenberg's counsel rendered legal services to the City for which the City owes them payment.

Finally, Rosenberg says that if his attorneys are not compensated, the City will be unjustly enriched. This argument is hopelessly underdeveloped; Rosenberg fails to explain how the City would be retaining "unintended largess" at the expense of Rosenberg's lawyers. In any case, *quantum meruit* and unjust enrichment are distinct theories. The elements set forth above are not met here. First, there is no evidence that Rosenberg's lawyers provided services "to benefit the City"; they acted for their client, and themselves (which is as it should be); that they had a mutuality of interest does not mean that Rosenberg's lawyers were providing services on the City's behalf. Second, there is no evidence that the City ever "accepted" services from Rosenberg's lawyers—it had plenty of its own and, rather than leave the case to Rosenberg's lawyers to litigate on the City's behalf, the City intervened and prosecuted the case itself. Third, there is no quasi-contract here; that is, some relationship that constituted an implied promise by the City to pay Rosenberg's lawyers.[8] In contrast to the run-of-the-mill *quantum meruit* case in which lawyer and client sever ties and the lawyer later seeks to recover for her contribution to the success of a lawsuit, there was no attorney-client relationship between the City and Rosenberg's lawyers. The City and Rosenberg have always maintained separate counsel. Rosenberg has not supported in any way the novel theory of obtaining fees from a non-client absent a statutory fee-shifting provision or a contract. *Quantum meruit* does not mean "a bill for services rendered to our client that may have helped yours, too."

Finally, it bears noting that there is an actual contract in play here: the terms of engagement between Rosenberg and his lawyers. He is the only person from whom the lawyers could obtain fees. If that fee is zero, because there was contingency-fee arrangement and Rosenberg was dismissed from this case, that is the nature of the beast. Lawyers working for contingency fee *always* put their own money on the line with no guarantee of payment. They cannot, however, hedge that risk by going after strangers to the fee agreement in search of compensation if their own client's claim fails.

*        *        *

Rosenberg is not awarded any share of the settlement proceeds, and his attorneys may recoup no fees from the other parties to this litigation. His motion is denied.

---

[8] This includes the Common Services agreement, which is simply a standard cooperation and information sharing agreement arranged at arms' length between two parties with overlapping interests in the lawsuit. It says nothing, and implies nothing, about fee-sharing for the lawyers.

Dated: April 27, 2017

John J. Tharp, Jr.
United States District Judge

# United States District Court
## Northern District of Illinois - CM/ECF LIVE, Ver 6.1.1 (Chicago)
## CIVIL DOCKET FOR CASE #: 1:15-cv-08271
### Internal Use Only

Rosenberg v. Redflex Traffic Systems, Inc.
Assigned to: Honorable John J. Tharp, Jr
Case in other court: Circuit Court of Cook County, Law
            Division, 14 L 4211
Cause: 28:1332 Diversity-Contract Dispute

Date Filed: 09/21/2015
Date Terminated: 02/09/2017
Jury Demand: Both
Nature of Suit: 190 Contract: Other
Jurisdiction: Federal Question

**Plaintiff**

**Aaron M Rosenberg**
*City of Chicago Ex Rel*

represented by **John Joseph Muldoon , III**
Muldoon & Muldoon LLC
30 North LaSalle Street
Suite 2950
Chicago, IL 60602
312-744-6929
Email: jjm@muldoonlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**City of Chicago**
*ex rel. Aaron Rosenberg*

represented by **Anthony James Masciopinto**
Kulwin, Masciopinto & Kulwin, LLP
161 North Clark Street
Suite 2500
Chicago, IL 60601
(312) 641-0300
Email: amasciopinto@kmklawllp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey R. Kulwin**
Kulwin, Masciopinto & Kulwin, LLP
161 North Clark Street
Suite 2500
Chicago, IL 60601
(312) 641-0300
Email: jkulwin@kmklawllp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Required Appendix 045

**Shelly Byron Kulwin**
Kulwin, Masciopinto & Kulwin, LLP
161 North Clark Street
Suite 2500
Chicago, IL 60601
(312) 641-0300
Email: skulwin@kmklawllp.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cornel Hershel Kauffman**
City of Chicago Department of Law
AERC
30 North LaSalle Street
Suite 1400
Chicago, IL 60602
(312) 742-0330
Email:
cornel.kauffman@cityofchicago.org
*ATTORNEY TO BE NOTICED*

**Fiona A Burke**
City of Chicago Department of Law
30 N. LaSalle
Suite 1400
Chicago, IL 60602
312-744-6929
Email: fiona.burke@cityofchicago.org
*ATTORNEY TO BE NOTICED*

**Rachel Anne Katz**
Kulwin, Masciopinto & Kulwin, LLP.
161 North Clark Street
Suite 2500
Chicago, IL 60601
312-641-0300
Email: rkatz@kmklawllp.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Redflex Traffic Systems, Inc.**          represented by **Steven A. Weiss**
*a Delaware corporation*                                      Honigman Miller Schwartz & Cohn LLP
                                                             One South Wacker Drive
                                                             28th Floor
                                                             Chicago, IL 60606

Required Appendix 046

(312) 701-9300
Email: sweiss@honigman.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Callie Jenna Sand**
Honigman Miller Schwartz & Cohn
1 S Wacker Dr
#2800
Chicago, IL 60606
(312) 701-9334
Email: csand@honigman.com
*ATTORNEY TO BE NOTICED*

**Ian Howard Fisher**
Hahn Loeser & Parks LLP
125 South Wacker Drive
Suite 2900
Chicago, IL 60606
(312) 637-3000
Email: ifisher@hahnlaw.com
*TERMINATED: 06/01/2016*

**William Butler Berndt**
Honigman Miller Schwartz and Cohn LLP
1 S. Wacker Drive
Suite 2800
Chicago, IL 60606
(312) 701-9300
Email: wberndt@honigman.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Redflex Holdings Limited**                    represented by **Callie Jenna Sand**
*an Australian company*                         (See above for address)
                                                *ATTORNEY TO BE NOTICED*

                                                **Ian Howard Fisher**
                                                (See above for address)
                                                *TERMINATED: 06/01/2016*

                                                **Steven A. Weiss**
                                                (See above for address)
                                                *ATTORNEY TO BE NOTICED*

                                                **William Butler Berndt**
                                                (See above for address)

Required Appendix 047

*ATTORNEY TO BE NOTICED*

**Intervenor Plaintiff**

**City Of Chicago**                      represented by    **Diane M. Pezanoski**
                                                          City of Chicago, Law Department
                                                          Corporation Counsel
                                                          30 North LaSalle, Suite 1020
                                                          Chicago, IL 60602
                                                          (312) 744-6996
                                                          Email: dpezanoski@cityofchicago.org
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Fiona A Burke**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Anna Davis Walker**
                                                          City Of Chicago, Department Of Law
                                                          30 N. Lasalle St.
                                                          9th Fl.
                                                          Chicago, IL 60602
                                                          (717) 645-2066
                                                          Email: anna.walker@cityofchicago.org
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Cornel Hershel Kauffman**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/21/2015 | 1 | NOTICE of Removal from Circuit Court of Cook County, Law Division, case number (14 L 4211) filed by Redflex Traffic Systems, Inc. Filing fee $ 400, receipt number 0752-11103569. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Weiss, Steven) (Entered: 09/21/2015) |
| 09/21/2015 | 2 | CIVIL Cover Sheet (Weiss, Steven) (Entered: 09/21/2015) |
| 09/21/2015 | 3 | ATTORNEY Appearance for Defendant Redflex Traffic Systems, Inc. by Steven A. Weiss (Weiss, Steven) (Entered: 09/21/2015) |
| 09/21/2015 | 4 | ATTORNEY Appearance for Defendant Redflex Traffic Systems, Inc. by Ian Howard Fisher (Fisher, Ian) (Entered: 09/21/2015) |
| 09/21/2015 | 5 | FRCP 7.1 and LR 3.2 Disclosure STATEMENT by Redflex Traffic Systems, Inc. (Weiss, Steven) (Entered: 09/21/2015) |

Required Appendix 048

CM/ECF LIVE, Ver 6.1.1 - U.S. District Court, Northern Illinois          https://ecf.ilnd.circ7.dcn/cgi-bin/DktRpt.pl?937876601215409-L_1_0-1

Case: 1:15-cv-08271 Document #: 95 Filed: 03/10/17 Page 45 of 52 PageID #:2563
Case: 17-1524     Document: 331     Filed: 10/12/2017     Pages: 114

| 09/21/2015 | | CASE ASSIGNED to the Honorable John J. Tharp, Jr. Designated as Magistrate Judge the Honorable Susan E. Cox. (mc, ) (Entered: 09/21/2015) |
|---|---|---|
| 09/22/2015 | 6 | MAILED Notice of Removal Letter to Plaintiff's Counsel, John Joseph Muldoon, III. (jh, ) (Entered: 09/22/2015) |
| 09/22/2015 | 7 | MINUTE entry before the Honorable John J. Tharp, Jr: The initial status conference in this matter is set for 10/1/15 at 9:00 a.m. The parties are directed to review the procedures and requirements for this conference on Judge Tharp's web site, which may be accessed at [www.ilnd.uscourts.gov/judges] and to submit the required Initial Status Report in Court on 10/1/15. Mailed notice (lcw, ) (Entered: 09/22/2015) |
| 09/22/2015 | 8 | ATTORNEY Appearance for Plaintiff Aaron M Rosenberg by John Joseph Muldoon, III (Muldoon, John) (Entered: 09/22/2015) |
| 09/23/2015 | 9 | MINUTE entry before the Honorable John J. Tharp, Jr: In clarification the Court's prior order 7 , the parties are not required so submit a written status report but should be prepared to orally brief the Court on the case when they appear at the hearing on 10/1/15. Mailed notice (lcw, ) (Entered: 09/23/2015) |
| 09/23/2015 | 10 | ATTORNEY Appearance for Intervenor Plaintiff City Of Chicago by Fiona A Burke (Burke, Fiona) (Entered: 09/23/2015) |
| 09/24/2015 | 11 | ATTORNEY Appearance for Intervenor Plaintiff City Of Chicago by Diane M. Pezanoski (Pezanoski, Diane) (Entered: 09/24/2015) |
| 10/01/2015 | 12 | MINUTE entry before the Honorable John J. Tharp, Jr:Status hearing held and continued to 12/3/15 at 9:00 a. m. Plaintiff is granted leave to file an amended complaint by 11/2/15. Defendant's answer or responsive pleading is due by 12/1/15. If the response is by motion, it is to be noticed for 12/3/15. Mailed notice (air, ) (Entered: 10/01/2015) |
| 10/26/2015 | 13 | MOTION by Intervenor Plaintiff City Of Chicago for extension of time to amend *Unopposed* (Burke, Fiona) (Entered: 10/26/2015) |
| 10/26/2015 | 14 | NOTICE of Motion by Fiona A Burke for presentment of motion for extension of time to amend 13 before Honorable John J. Tharp Jr. on 10/29/2015 at 09:00 AM. (Burke, Fiona) (Entered: 10/26/2015) |
| 10/27/2015 | 15 | MINUTE entry before the Honorable John J. Tharp, Jr:The motion for extension of time to amend the complaint 13 is granted. No appearance on the motion is required. The amended complaint shall be filed by 11/13/2015. The response to the amended complaint is due 12/14/15. The status hearing of 12/3/15 is stricken and re-set to 12/15/2015 at 9:00 a.m. Mailed notice (air, ) (Entered: 10/27/2015) |
| 11/06/2015 | 16 | ORDER: The Court has received the attached correspondence from counsel to a non-party who has not entered an appearance in this case and has not sought leave to do so. The correspondence appears to have been sent to the Court in an effort to influence the proceedings in this case. This communication with the Court by an attorney was unsolicited and unauthorized and will therefore not be considered by the Court. Any attorney representing an individual or entity |

| | | |
|---|---|---|
| | | seeking to participate in this matter must file a motion, with notice to all parties, to intervene, or to appear for a limited purpose, or to otherwise participate in this proceeding. No further presentation or submission of legal argument or factual material relevant to this case may be made without leave of court. The Clerk of the Court is directed to mail a copy of this order to the attorney who sent the attached correspondence. Signed by the Honorable John J. Tharp, Jr on 11/6/2015. (Attachments: # 1 Letter)Mailed notice (air, ) (Entered: 11/06/2015) |
| 11/06/2015 | 17 | ATTORNEY Appearance for Intervenor Plaintiff City Of Chicago by Anna Davis Walker (Walker, Anna) (Entered: 11/06/2015) |
| 11/06/2015 | 18 | MOTION by Intervenor Plaintiff City Of Chicago for extension of time to amend *Agreed* (Burke, Fiona) (Entered: 11/06/2015) |
| 11/06/2015 | 19 | NOTICE of Motion by Fiona A Burke for presentment of motion for extension of time to amend 18 before Honorable John J. Tharp Jr. on 11/17/2015 at 09:00 AM. (Burke, Fiona) (Entered: 11/06/2015) |
| 11/09/2015 | 20 | MINUTE entry before the Honorable John J. Tharp, Jr:Plaintiff's agreed motion for extension of time to file first amended complaint 18 is granted. No appearance on the motion is required. The first amended complaint shall be filed on or before November 30, 2015. Defendant's response to the first amended complaint will be due December 30, 2015. Mailed notice (air, ) (Entered: 11/09/2015) |
| 11/09/2015 | | MAILED a copy of order dated 11/6/15 to Patrick J. Keating at Roberts McGivney Zagotta LLC 55 West Monroe, Suite 1700 Chicago, IL 60603. (sj, ) (Entered: 11/09/2015) |
| 11/20/2015 | 21 | MOTION by Intervenor Plaintiff City Of Chicago for extension of time to amend *Agreed* (Burke, Fiona) (Entered: 11/20/2015) |
| 11/20/2015 | 22 | NOTICE of Motion by Fiona A Burke for presentment of motion for extension of time to amend 21 before Honorable John J. Tharp Jr. on 11/25/2015 at 09:00 AM. (Burke, Fiona) (Entered: 11/20/2015) |
| 11/23/2015 | 23 | MINUTE entry before the Honorable John J. Tharp, Jr:Plaintiff City of Chicagos third unopposed motion for extension of time to amend the complaint 21 is granted. No appearance on the motion is required. The amended complaint is due December 14, 2015, and defendant RTSI shall answer or otherwise plead by January 14, 2016. The status hearing of 12/15/15 is stricken and re-set to 1/21/16 at 9:00 a.m. Mailed notice (air, ) (Entered: 11/23/2015) |
| 12/14/2015 | 24 | ATTORNEY Appearance for Intervenor Plaintiff City Of Chicago by Cornel Hershel Kauffman (Kauffman, Cornel) (Entered: 12/14/2015) |
| 12/14/2015 | 25 | *First* AMENDED complaint by City Of Chicago against Redflex Traffic Systems, Inc., Redflex Holdings Limited (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, |

Required Appendix 050

| | | |
|---|---|---|
| | | # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29)(Burke, Fiona) (Entered: 12/14/2015) |
| 12/15/2015 | | SUMMONS Issued as to Defendant Redflex Holdings Limited (pg, ) (Entered: 12/15/2015) |
| 01/05/2016 | 26 | MOTION by Defendant Redflex Traffic Systems, Inc. for extension of time to file answer regarding amended complaint,, 25 (Fisher, Ian) (Entered: 01/05/2016) |
| 01/05/2016 | 27 | *NOTICE OF UNOPPOSED MOTION* NOTICE of Motion by Ian Howard Fisher for presentment of motion for extension of time to file answer, motion for relief 26 before Honorable John J. Tharp Jr. on 1/12/2016 at 09:00 AM. (Fisher, Ian) (Entered: 01/05/2016) |
| 01/06/2016 | 28 | MINUTE entry before the Honorable John J. Tharp, Jr:Defendant's unopposed motion for extension of time 26 is granted. No appearance on the motion is required. The responsive pleading is due 2/15/16. The status hearing of 1/21/16 is stricken and re-set for 2/18/16 at 9:00 a.m. Mailed notice (air, ) (Entered: 01/06/2016) |
| 02/16/2016 | 29 | MOTION by Defendants Redflex Holdings Limited, Redflex Traffic Systems, Inc. to dismiss *Relator* (Weiss, Steven) (Entered: 02/16/2016) |
| 02/16/2016 | 30 | MEMORANDUM by Redflex Holdings Limited, Redflex Traffic Systems, Inc. in support of motion to dismiss 29 (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H)(Weiss, Steven) (Entered: 02/16/2016) |
| 02/16/2016 | 31 | NOTICE of Motion by Steven A. Weiss for presentment of motion to dismiss 29 before Honorable John J. Tharp Jr. on 2/23/2016 at 09:00 AM. (Weiss, Steven) (Entered: 02/16/2016) |
| 02/16/2016 | 32 | ANSWER to amended complaint *and Affirmative Defenses* by Redflex Holdings Limited, Redflex Traffic Systems, Inc.(Weiss, Steven) (Entered: 02/16/2016) |
| 02/16/2016 | 33 | ATTORNEY Appearance for Defendant Redflex Holdings Limited by Steven A. Weiss (Weiss, Steven) (Entered: 02/16/2016) |
| 02/16/2016 | 34 | ATTORNEY Appearance for Defendant Redflex Holdings Limited by Ian Howard Fisher (Fisher, Ian) (Entered: 02/16/2016) |
| 02/16/2016 | 35 | NOTIFICATION of Affiliates pursuant to Local Rule 3.2 by Redflex Holdings Limited (Weiss, Steven) (Entered: 02/16/2016) |
| 02/18/2016 | 36 | MINUTE entry before the Honorable John J. Tharp, Jr:Status hearing held and continued to 5/26/16 at 9:00 a.m. Defendants' motion to dismiss 29 is taken under advisement. Responses by both the Realtor and the City to the Defendants' motion to dismiss are due by 4/4/16. Defendants' reply is due by 4/25/16. Notice of presentment date of 2/23/16 is stricken. Pending ruling on the motion to |

| | | dismiss, the Relator may not initiate discovery requests. The City and the defendant are to exchange Rule 26(a)(1) disclosures by 3/10/16. Mailed notice (air, ) (Entered: 02/18/2016) |
|---|---|---|
| 02/22/2016 | 37 | MOTION by Defendants Redflex Holdings Limited, Redflex Traffic Systems, Inc. for leave to file *Supplemental Authority in Response to Court's Question on Defendants' Motion to Dismiss Relator* (Attachments: # 1 Exhibit A)(Fisher, Ian) (Entered: 02/22/2016) |
| 02/22/2016 | 38 | NOTICE of Motion by Ian Howard Fisher for presentment of motion for leave to file, 37 before Honorable John J. Tharp Jr. on 2/25/2016 at 09:00 AM. (Fisher, Ian) (Entered: 02/22/2016) |
| 02/23/2016 | 39 | MINUTE entry before the Honorable John J. Tharp, Jr:The defendants' motion for leave to file supplemental authority 37 is granted. No appearance on the motion is required. Defendants shall file their supplement as a separate docket entry. The briefing schedule on the motion to dismiss remains in place. Mailed notice (air, ) (Entered: 02/23/2016) |
| 02/23/2016 | 40 | SUPPLEMENT to motion to dismiss 29 *SUPPLEMENTAL AUTHORITY IN RESPONSE TO COURT'S QUESTION ON DEFENDANTS' MOTION TO DISMISS RELATOR* (Fisher, Ian) (Entered: 02/23/2016) |
| 03/16/2016 | 41 | SUMMONS Returned Executed by City Of Chicago, City of Chicago as to Redflex Holdings Limited on 1/21/2016, answer due 2/11/2016. (Kauffman, Cornel) (Entered: 03/16/2016) |
| 04/04/2016 | 42 | RESPONSE by City of Chicago to MOTION by Defendants Redflex Holdings Limited, Redflex Traffic Systems, Inc. to dismiss *Relator* 29 *City of Chicago's Position Statement Regarding Defendants' Ordinance Interpretation Argument in Their Motion to Dismiss Relator* (Pezanoski, Diane) (Entered: 04/04/2016) |
| 04/04/2016 | 43 | MOTION by Plaintiff Aaron M Rosenberg for leave to file excess pages *in Opposition to Motion to Dismiss* (Attachments: # 1 Exhibit 1)(Muldoon, John) (Entered: 04/04/2016) |
| 04/04/2016 | 44 | CERTIFICATE of Service by Plaintiff Aaron M Rosenberg regarding MOTION by Plaintiff Aaron M Rosenberg for leave to file excess pages *in Opposition to Motion to Dismiss* 43 (Muldoon, John) (Entered: 04/04/2016) |
| 04/04/2016 | 45 | NOTICE of Motion by John Joseph Muldoon, III for presentment of motion for leave to file excess pages 43 before Honorable John J. Tharp Jr. on 4/13/2016 at 09:00 AM. (Muldoon, John) (Entered: 04/04/2016) |
| 04/05/2016 | 46 | MINUTE entry before the Honorable John J. Tharp, Jr: The relator's motion for leave to file instanter a response brief of 19 pages 43 is granted. The response brief shall be filed as a separate docket entry. Mailed notice (air, ) (Entered: 04/05/2016) |
| 04/05/2016 | 47 | RESPONSE by Aaron M Rosenbergin Opposition to MOTION by Defendants Redflex Holdings Limited, Redflex Traffic Systems, Inc. to dismiss *Relator* 29 (Muldoon, John) (Entered: 04/05/2016) |

Required Appendix 052

| 04/19/2016 | 48 | ATTORNEY Appearance for Defendants Redflex Holdings Limited, Redflex Traffic Systems, Inc. by William Butler Berndt (Berndt, William) (Entered: 04/19/2016) |
|---|---|---|
| 04/19/2016 | 49 | MOTION by Defendants Redflex Holdings Limited, Redflex Traffic Systems, Inc. for extension of time to file response/reply as to order on motion to dismiss,,,, status hearing,,, set motion and R&R deadlines/hearings,,,, set/reset hearings,,, terminate hearings,, 36 *Unopposed* (Berndt, William) (Entered: 04/19/2016) |
| 04/19/2016 | 50 | NOTICE of Motion by William Butler Berndt for presentment of motion for extension of time to file response/reply,, motion for relief,,,,,,,,, 49 before Honorable John J. Tharp Jr. on 4/26/2016 at 09:00 AM. (Berndt, William) (Entered: 04/19/2016) |
| 04/20/2016 | 51 | MINUTE entry before the Honorable John J. Tharp, Jr:The defendants' unopposed motion for extension of time to file its reply brief 49 is granted. No appearance on the motion is required. The reply brief is due 5/16/16. Mailed notice (air, ) (Entered: 04/20/2016) |
| 05/16/2016 | 52 | REPLY by Defendants Redflex Holdings Limited, Redflex Traffic Systems, Inc. to motion to dismiss 29 *Defendants' Reply Brief In Support Of Their Motion To Dismiss Relator* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Appendix Part 1 of 2, # 4 Appendix Part 2 of 2)(Berndt, William) (Entered: 05/16/2016) |
| 05/24/2016 | 53 | MOTION by Plaintiff Aaron M Rosenberg for leave to file *Sur-Reply* (Attachments: # 1 Exhibit 1)(Muldoon, John) (Entered: 05/24/2016) |
| 05/24/2016 | 54 | NOTICE of Motion by John Joseph Muldoon, III for presentment of motion for leave to file 53 before Honorable John J. Tharp Jr. on 6/1/2016 at 09:00 AM. (Muldoon, John) (Entered: 05/24/2016) |
| 05/26/2016 | 55 | SUR-REPLY by Plaintiff Aaron M Rosenberg to reply, 52 (Muldoon, John) (Entered: 05/26/2016) |
| 05/26/2016 | 56 | MINUTE entry before the Honorable John J. Tharp, Jr: Status hearing held and continued to 8/2/16 at 9:00 a.m. Plaintiff's motion for leave to file sur-reply 53 is granted. Mailed notice (air, ) (Entered: 05/26/2016) |
| 05/31/2016 | 57 | MOTION by Attorney Ian H. Fisher to withdraw as attorney for Redflex Holdings Limited, Redflex Traffic Systems, Inc.. No party information provided (Fisher, Ian) (Entered: 05/31/2016) |
| 06/01/2016 | 58 | MINUTE entry before the Honorable John J. Tharp, Jr:The motion of attorney Ian H. Fisher to withdraw as counsel for defendants 57 is granted. No appearance on the motion is required. Further, defendant's attorney William B. Berndt is directed to update his ECF registration with his current law firm contact information. Mailed notice (air, ) (Entered: 06/01/2016) |
| 06/03/2016 | 59 | NOTICE by William Butler Berndt of Change of Address *Change of Firm Name* (Berndt, William) (Entered: 06/03/2016) |

CM/ECF LIVE, Ver 6.1.1 - U.S. District Court, Northern Illinois      https://ecf.ilnd.circ7.dcn/cgi-bin/DktRpt.pl?937876601215409-L_1_0-1

Case: 1:15-cv-08271 Document #: 95 Filed: 03/10/17 Page 50 of 52 PageID #:2568
Case: 17-1524      Document: 331      Filed: 10/31/2017      Pages: 114

| 06/03/2016 | 60 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 50, receipt number 0752-12004585. (Sand, Callie) (Entered: 06/03/2016) |
|---|---|---|
| 06/06/2016 | 61 | MINUTE entry before the Honorable John J. Tharp, Jr: The motion of Callie J. Sand for leave to appear pro hac vice 60 is granted. Ms. Sand may file an appearance for the defendants. Mailed notice (ber, ) (Entered: 06/06/2016) |
| 08/02/2016 | 62 | MINUTE entry before the Honorable John J. Tharp, Jr: Status hearing held and continued to 8/30/16 at 9:00 a.m. The Defendants' Motion to Dismiss 29 is granted for reasons stated on the record. An Opinion will follow. Parties are to confer regarding discovery and present a more detailed discovery schedule by the next hearing date. Mailed notice (air, ) (Entered: 08/02/2016) |
| 08/08/2016 | 63 | MEMORANDUM Opinion and Order: Signed by the Honorable John J. Tharp, Jr on 8/8/2016. Mailed notice(air, ) (Entered: 08/08/2016) |
| 08/10/2016 | 64 | TRANSCRIPT OF PROCEEDINGS held on August 2, 2016 before the Honorable John J. Tharp, Jr. Court Reporter Contact Information: Kelly M. Fitzgerald, kelly_fitzgerald@ilnd.uscourts.gov, 312-818-6626. <P>IMPORTANT: The transcript may be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through the Court Reporter/Transcriber or PACER. For further information on the redaction process, see the Court's web site at www.ilnd.uscourts.gov under Quick Links select Policy Regarding the Availability of Transcripts of Court Proceedings.</P> Redaction Request due 8/31/2016. Redacted Transcript Deadline set for 9/12/2016. Release of Transcript Restriction set for 11/8/2016. (Fitzgerald, Kelly) (Entered: 08/10/2016) |
| 08/12/2016 | 65 | ATTORNEY Appearance for Defendants Redflex Holdings Limited, Redflex Traffic Systems, Inc. by Callie J. Sand (Sand, Callie) (Entered: 08/12/2016) |
| 08/26/2016 | 66 | ATTORNEY Appearance for Plaintiff City of Chicago by Shelly Byron Kulwin (Kulwin, Shelly) (Entered: 08/26/2016) |
| 08/26/2016 | 67 | ATTORNEY Appearance for Plaintiff City of Chicago by Anthony James Masciopinto (Masciopinto, Anthony) (Entered: 08/26/2016) |
| 08/26/2016 | 68 | ATTORNEY Appearance for Plaintiff City of Chicago by Jeffrey R. Kulwin (Kulwin, Jeffrey) (Entered: 08/26/2016) |
| 08/26/2016 | 69 | ATTORNEY Appearance for Plaintiff City of Chicago by Rachel Anne Katz (Katz, Rachel) (Entered: 08/26/2016) |
| 08/29/2016 | 70 | MINUTE entry before the Honorable John J. Tharp, Jr: On the Court's own motion, the status hearing in this matter is reset for 9:30 a.m. on 8/30/16. Mailed notice (air, ) (Entered: 08/29/2016) |
| 08/30/2016 | 71 | MINUTE entry before the Honorable John J. Tharp, Jr: Status hearing held and continued to 12/8/16 at 9:00 a.m. The parties proposed case scheduling order is adopted as follows: Fact discovery cutoff set on 6/30/17; Expert disclosure reports due by 7/31/17; Responsive expert reports due by 9/1/17; Expert |

Required Appendix 054

| | | discovery to conclude 10/2/17; Dispositive motions due 11/1/17. Mailed notice (air, ) (Entered: 08/31/2016) |
|---|---|---|
| 10/27/2016 | 72 | MOTION by Intervenor Plaintiff City Of Chicago, Defendants Redflex Holdings Limited, Redflex Traffic Systems, Inc. for protective order *Joint Motion for Entry of Confidentiality Order* (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Berndt, William) (Entered: 10/27/2016) |
| 10/27/2016 | 73 | NOTICE of Motion by William Butler Berndt for presentment of motion for protective order, 72 before Honorable John J. Tharp Jr. on 11/2/2016 at 09:00 AM. (Berndt, William) (Entered: 10/27/2016) |
| 11/02/2016 | 74 | MINUTE entry before the Honorable John J. Tharp, Jr: Motion hearing held. Joint Motion for Entry of Confidentiality Order 72 is granted. ENTER ORDER. Mailed notice (air, ) (Entered: 11/03/2016) |
| 11/02/2016 | 75 | AGREED Confidentiality and FRE 502(d) and (3) Clawback Order: Signed by the Honorable John J. Tharp, Jr on 11/2/2016. Mailed notice(air, ) (Entered: 11/04/2016) |
| 12/02/2016 | 76 | MINUTE entry before the Honorable John J. Tharp, Jr:On the Court's own motion, the status hearing of 12/8/16 is re-set for for 1/31/2017 at 9:00 a.m. Mailed notice (air, ) (Entered: 12/02/2016) |
| 01/27/2017 | 77 | MINUTE entry before the Honorable John J. Tharp, Jr:Upon the parties' agreed telephonic request, the status hearing of 1/31/17 is stricken and re-set for 2/15/17 at 9:00 a.m. Mailed notice (air, ) (Entered: 01/27/2017) |
| 02/06/2017 | 78 | MOTION by Plaintiff City of Chicago to dismiss *Agreed* (Burke, Fiona) (Entered: 02/06/2017) |
| 02/06/2017 | 79 | NOTICE of Motion by Fiona A Burke for presentment of motion to dismiss 78 before Honorable John J. Tharp Jr. on 2/9/2017 at 09:00 AM. (Burke, Fiona) (Entered: 02/06/2017) |
| 02/07/2017 | 80 | Attorneys' Lien by Aaron M Rosenberg (Muldoon, John) (Entered: 02/07/2017) |
| 02/07/2017 | 81 | Relator's Lien by Aaron M Rosenberg (Muldoon, John) (Entered: 02/07/2017) |
| 02/08/2017 | 82 | Objection to Settlement by Aaron M Rosenberg (Muldoon, John) (Entered: 02/08/2017) |
| 02/08/2017 | 83 | NOTICE of Motion by John Joseph Muldoon, III for presentment of before Honorable John J. Tharp Jr. on 2/9/2017 at 09:00 AM. (Muldoon, John) (Entered: 02/08/2017) |
| 02/09/2017 | 84 | Exhibit by Aaron M Rosenberg *To Objection to Dismissal and Setlement* (Muldoon, John) (Entered: 02/09/2017) |
| 02/09/2017 | 85 | MINUTE entry before the Honorable John J. Tharp, Jr:Motion hearing held. For the reasons stated on the record, Plaintiff's agreed motion to dismiss 78 is granted and Aaron Rosenberg's objection to the dismissal motion 82 is overruled. The case is dismissed with prejudice. Any pending hearings are |

| | | |
|---|---|---|
| | | stricken and any pending motions are denied as moot. Civil case terminated. Mailed notice (air, ) (Entered: 02/10/2017) |
| 02/23/2017 | 86 | MOTION by Plaintiff Aaron M Rosenberg for attorney fees *and Share of Settlement Proceeds* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Muldoon, John) (Entered: 02/23/2017) |
| 02/23/2017 | 87 | NOTICE of Motion by John Joseph Muldoon, III for presentment of motion for attorney fees 86 before Honorable John J. Tharp Jr. on 3/8/2017 at 09:00 AM. (Muldoon, John) (Entered: 02/23/2017) |
| 02/27/2017 | 88 | MINUTE entry before the Honorable John J. Tharp, Jr:The City is directed to file a response to Mr. Rosenberg's motion for attorney fees and share of settlement proceed 86 by 3/13/17. No appearance on the motion is required on 3/8/17. The Court will rule, request further briefing, or set a hearing date after review of the City's response.Mailed notice (lxs, ) (Entered: 02/27/2017) |
| 02/27/2017 | 89 | MOTION by Plaintiff Aaron M Rosenberg to seal *Exhibit 86-3* (Muldoon, John) (Entered: 02/27/2017) |
| 02/27/2017 | 90 | NOTICE of Motion by John Joseph Muldoon, III for presentment of motion to seal 89 before Honorable John J. Tharp Jr. on 3/8/2017 at 09:00 AM. (Muldoon, John) (Entered: 02/27/2017) |
| 03/01/2017 | 91 | RESPONSE by Redflex Holdings Limited, Redflex Traffic Systems, Inc. to MOTION by Plaintiff Aaron M Rosenberg to seal *Exhibit 86-3* 89 (Attachments: # 1 Exhibit 1)(Berndt, William) (Entered: 03/01/2017) |
| 03/08/2017 | 92 | MINUTE entry before the Honorable John J. Tharp, Jr:Motion hearing held. Plaintiff's motion to file exhibit under seal 89 is denied without prejudice for reasons stated on the record. Redflex is granted leave to file its response to Mr. Rosenberg's motion for attorney fees and share of settlement proceed 86 by 3/13/17. Mailed notice (air, ) (Entered: 03/08/2017) |
| 03/10/2017 | 93 | NOTICE of appeal by Aaron M Rosenberg regarding orders 62 , 63 , 85 Filing fee $ 505, receipt number 0752-12947995. (Muldoon, John) (Entered: 03/10/2017) |
| 03/10/2017 | 94 | NOTICE of Appeal Due letter sent to counsel of record regarding notice of appeal 93 (ek, ) (Entered: 03/10/2017) |

Required Appendix 056